### UNITED STATES
v.
**Airman First Class Dennis J. DUGA, FR 012–48–6447 United States Air Force.**

**ACM S24700.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 22 Nov. 1978.

Decided 18 June 1979.

---

Appellate Counsel for the Accused: Colonel B. Ellis Phillips and Captain Wade B. Morrison.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., and Colonel Michel Levant, USAFR.

Before EARLY, HERMAN, ORSER and ARROWOOD, Appellate Military Judges.

## DECISION

ARROWOOD, Judge:

Contrary to his plea, the accused was convicted by special court-martial of larceny of a canoe in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921.

On 7 August 1978, Airman Byers, a friend of the accused was on duty as the security guard at Gate 4, Lowry Air Force Base, Colorado. At approximately 7:00 o'clock in the evening the accused rode up to the gate on his bicycle. He was not in uniform and, although he was assigned to the same security police squadron as Byers, he had not performed security police duties for several months due to his involvement in the offense charged. Both were airmen first class, single and lived in the same dormitory on the base.

When Byers was asked what transpired at the gate this testimony followed:

A  .  .  .  I asked him what he was up to. He said, well, he was looking for a place to hide his van because the OSI [Air Force Office of Special Investigation] was looking for it and he said he still had something in it. Well, at this time, you know, I had heard a lot of rumors about things that had been happening and I just kind of wondered because I had been really in the dark about it. So I asked him, I said, well, I said are a lot of those things true, you know? I said, that you've been able to get into buildings and things like this? He said well, he told me yeah, he knew how to get into half the buildings on base.

Q  Excuse me, Airman Byers. In what capacity were you asking these questions? Were you acting officially as a security policeman?

A  No. I was acting more or less like— buddy-to-buddy talk you might say.

Q How good of friends were you at the time with the accused?

A Oh, I just knew him, like I said before; we'd go out socially, you know, off together in an evening or something like that.

Q Who started the entire conversation?

A Oh, I don't know, I just kind of asked him what was going on. If you want to call that starting a conversation, I'd have to say that I started it.

Q Okay. Could you continue please?

A And so I got into asking him about, well, what was happening and I was just kind of wondering about all the things that had been happening. He said, yeah, he knew how to get into most of the buildings on the base. And so I asked him, well, what was the deal that was going on back when he was on leave? He said, well, they caught me with the canoe and the chain saw. And so I asked him, I said where did you get those? He told me that he'd gotten a chain saw out of a building on base he'd found insecure one night when he was at work. He said the canoe he'd gotten out of the recreational vehicle area on base.

Q How long approximately did you talk to the accused on that occasion?

A Oh, I'd say approximately maybe 30 minutes.

On cross-examination Byers stated he had made a statement concerning the accused to the OSI earlier on 7 August and they had told him if he "got any further information to bring it to them." On 10 August he contacted the OSI and gave them a detailed statement concerning the conversation with the accused.

Upon further questioning by the military judge the following transpired:

Q Airman Byers, prior to your speaking with Airman Duga that night, had the OSI asked you to go ahead and find out anything you could?

A No, sir.

Q What do you recall that they said to you specifically about finding out or reporting any information?

A They had stated to me that if I could find anything out for them, it would be helpful and to give the man I talked to a call.

Q What did you reply to that?

A I don't remember my exact words, but I just told him, I said, well, if anything comes up I'll see what I can do—something to that nature.

Q What was your purpose then in speaking with Airman Duga that evening, on the 7th?

A Well, Your Honor, I was speaking more or less like a friend to a friend because I'd heard an awful lot of rumors and I was just wondering myself if they were true and as I found out, a lot more than I'd heard was actually true, as far as the situation.

Q Was it your purpose at that time to find out information for the OSI?

A No, your Honor.

Q Why were you interested in finding out such information about Airman Duga?

A Just out of my own curiosity, Your Honor. Like I said, I'd heard an awful lot of rumors and I was just kind of curious myself as to if there was any truth to them or not.

Q Did you think that you were going to find out anything?

A I really didn't know, Your Honor.

Q Did you think about at that time what you would do with the information if you found out anything?

A No, Your Honor, I never really thought about it.

Appellate defense counsel contend that the military judge erred when he overruled trial defense counsel's objection and admitted the accused's pretrial admissions to Byers as they were obtained in contravention of his Article 31(b), Code, 10 U.S.C. § 831(b), supra, rights.

Article 31(b), Code, supra, provides· in pertinent part:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

■ Article 31, however, does not require threshold advice in every situation where a service member questions another about an offense the other has committed. *United States v. Woods*, 22 U.S.C.M.A. 369, 47 C.M.R. 124 (1973). In considering factual situations similar to this case the Court of Military Appeals has analyzed the facts to determine if the interrogator was acting in an official capacity or was motivated solely by personal considerations. If the questioning was found to be official, a preliminary warning was required. *United States v. Carlisle*, 22 U.S.C.M.A. 564, 48 C.M.R. 71 (1973); *United States v. Harvey*, 21 U.S.C.M.A. 39, 44 C.M.R. 93 (1971); *United States v. McCrary*, 18 U.S.C.M.A. 104, 39 C.M.R. 104 (1969); *United States v. Hinkson*, 17 U.S.C.M.A. 126, 37 C.M.R. 390 (1967); *United States v. Beck*, 15 U.S.C.M.A. 333, 35 C.M.R. 305 (1965); *United States v. Gibson*, 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954).*

In this case the testimony of Byers was the only evidence of this conversation with the accused. We must, therefore, consider carefully what was said during the conversation and the actions of the parties, both before and after the meeting, to determine whether Byers was acting officially or solely for personal reasons when he questioned the accused without preliminary advice.

■ Byers' position as a gate guard did not place him in an official position relative to the accused during their conversation. Neither his actions as the accused ap-

proached the gate, nor the questions and answers that followed, played any part in Byers' duties as a gate guard. See *United States v. Beck* and *United States v. Harvey*, both supra.

Clearly, Byers' reason for asking the questions was to satisfy his own curiosity as to the rumors he had heard about the accused. In fact, he denied that his motivation was anything other than personal considerations. The accused's stopping at the gate was unexpected and provided Byers an opportunity to pass some time by talking to someone he knew. The accused's answer to the nonsuggestive question—"What's going on?"—served to heighten Byers' curiosity as to the prior misconduct of the accused and provided him an opportunity to discover if the rumors he had heard were true. We have no reason to doubt Byers' testimony that while talking to the accused he did not even consider the conversation to be incriminating or whether he should report it to the OSI. *United States v. Carlisle*, supra.

To rebut this testimony trial defense counsel brought out the fact that Byers had been previously questioned by the OSI about the activities of the accused, was asked to provide them with any information which came to his attention and reported the conversation to the OSI. Byers denied being solicited by them to question the accused. The credibility of his denial is validated by the fact that he did not seek out the accused to question him or report the conversation to the OSI until several days later, after he had time to reflect on what had occurred. *United States v. Carlisle*, supra.

The facts in this case are in sharp contrast to those in *United States v. Johnstone*, 5 M.J. 744 (A.F.C.M.R.1978), where the OSI instructed their undercover informant to discreetly question the accused about property they believed he had stolen. There, we held that sending the informant to accomplish precisely that which the OSI could not personally do rendered the informant's con-

---

* We are not here concerned as the Court of Military Appeals was in *United States v. Dohle*, 1 M.J. 223 (C.M.A.1975), with statements made by a suspect in response to questions by a person, subject to the Code, who is in a posi-

tion of authority over the accused. In this case there is no evidence from which the court could reasonably find that Byers was in a position of authority over the accused.

duct "official" for the purpose of Article 31, and required the accused's admissions to be excluded from evidence.

In the case at hand, Byers was not an OSI informant and they did not ask him to question the accused. Their request, to report any additional information he received, was nothing more than a request to do what any good citizen should do. Such a request by the OSI did not make Byers a *de facto* agent of the OSI or reach a level which made his questioning of the accused "official" for purposes of Article 31.

Weighing the evidence, we are convinced that Byers' conversation with the accused was solely personal and that the questions asked were prompted only by his desire to satisfy his own curiosity. Therefore, we find that Byers was not acting officially and that the military judge did not err by admitting the pretrial admissions of the accused into evidence.

The remaining assignments of error were discussed by the staff judge advocate in his review and properly decided adversely to the accused.

The findings of guilty and the sentence are

AFFIRMED.

EARLY, Chief Judge, HERMAN and ORSER, Judges, concur.