**UNITED STATES, Appellant,**

v.

**Brady R. KIRBY, Sergeant, U.S. Air Force, Appellee.**

No. 33,950.

ACM 22142.

U. S. Court of Military Appeals.

Nov. 5, 1979.

For Appellant: *Major Gilbert J. Regan* (argued); *Colonel Julius L. Ullerich, Jr.* (on brief).

For Appellee: *Major Bruce R. Houston* (argued); *Colonel Robert W. Norris* (on brief).

Opinion

PERRY,* Judge:

The appellee was convicted by a general court-martial of two specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921. He was sentenced by the military judge to a dishonorable discharge, confinement at hard labor for 10 months, forfeiture of $100 pay per month for 10 months, and reduction to the lowest enlisted grade. The convening authority approved the findings, but permitted to stand only so much of the sentence as provided for a bad-conduct discharge, confinement at hard labor for 6 months, and reduction to the lowest enlisted grade.

On appeal, the United States Air Force Court of Military Review set aside all findings and the sentence, with leave to the Government to conduct a rehearing.[1] The *ratio decidendi* of that decision was that English,[2] the appellee's roommate, was acting in an official capacity in relation to the Air Force Office of Special Investigations

---

* Judge Matthew J. Perry took final action in this case prior to his resignation as a judge of this Court pursuant to his appointment and confirmation as a United States District Judge for the District of South Carolina.

1. The Opinion of the intermediate court explaining its decision is unpublished.

2. While the trial defense counsel referred to English as a sergeant at one point during the trial, he corrected himself and referred to him as an airman. The parties on appeal disagree as to the rank of English, who did not testify at trial; the Court of Military Review treated him as a sergeant. However, our view of the issue renders English's rank immaterial.

(OSI) when he urged the appellee to return certain stolen goods, and that the appellee's act in doing so was a verbal act, the voluntariness of which must be measured along the same guidelines as a confession. *United States v. Borodzik*, 21 U.S.C.M.A. 95, 44 C.M.R. 149 (1971). Finding that English did not advise the appellee of the latter's rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b), the Court of Military Review ruled that the implicit confession of the appellee in returning the goods was inadmissible. His subsequently executed confession to the OSI, additional stolen items discovered in a later search of the appellee's quarters pursuant to his "consent" therefor, and the appellee's oral confession to having stolen these items as well, were held to be fruits of the poisonous initial violation of the appellee's Article 31(b) rights and, likewise, inadmissible.

Thereupon, the Judge Advocate General of the Air Force certified the following issues to this Court:

    1. Was the Court of Military Review correct in holding that the conduct of the accused's roommate was "official" conduct within the ambit of Article 31 [10 U.S.C.A. § 831]?

    2. If issue 1 is answered in the affirmative, was the Court of Military Review correct in holding that the accused's consent to the search of his trailer was tainted by his act of turning over the stolen property?

In May 1976, the OSI at Keesler Air Force Base, Mississippi, received information that certain property which was missing from the base medical center had been seen in a trailer shared by the appellee, as well as English and English's wife. One of the agents interviewed English, who denied the theft of the property. However, English indicated that he had seen that the appellee had such property at the trailer and suggested that he be permitted to attempt to persuade the appellee to surrender it to the OSI. "He said he didn't know

whether he could or not, but he would" try. The request was conveyed to the OSI detachment commander, who agreed that it "seemed like the only thing to do since we didn't have probable cause for a search warrant." No promises were made to English conditioned on return of the property.

Later that day, English and the appellee walked into the OSI office, one carrying a microscope and the other carrying an illuminator, each of which had previously been reported stolen from the hospital. Following a warning as to his Article 31/*Tempia*[3] rights, the appellee executed a statement admitting larceny of the returned property, but he denied having stolen anything else. Additionally, he told the OSI that he had returned the two items because English had "came [sic] right out and said I'd better bring these back, that you know I've got them anyway."

Subsequent to his confessing to having stolen the microscope and the illuminator, the appellee was asked if he would consent to a search of his residence, and he responded in the affirmative. At that time, the appellee was handed a consent-to-search form and told to read it. Thereon, it advised, *inter alia*, that he had the absolute right to refuse to give consent and that he could consult a lawyer before giving his consent. Prior to signing the form, the appellee asked if giving permission to search the trailer meant that the OSI could come back in two or three days and search again. When he was apprised that the consent was good only for a single search on that date, the appellee signed the form. At the trailer, prior to the initiation of the search, he was reminded of his consent "rights" and that his interrogation rights were still in effect. When he renewed his consent, a search ensued, uncovering the additional items forming the basis for specification 2. Thereafter, the appellee orally admitted having also stolen these items from the medical center.

---

**3.** Article 31, Uniform Code of Military Justice, 10 U.S.C. § 931; *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

The principal question before us is whether English's conduct was "official" in nature, thereby requiring that Article 31 warnings be given. It was held below that "the OSI sanction of English's suggested course of action rendered English's participation official for Article 31 warning purposes."

In determining whether English acted in an official capacity, we recognize that the OSI agreed to allow English to proceed. However, they did not contribute in any way to the details of English's activities. He was given no directions or advice. There was not even any arrangement for English to make reports to OSI on his progress. No promises were made to English conditioned on return of the property. Agent Reid even admitted that they did not have any assurance that English would not give "Sergeant Kirby the opportunity to destroy the property" or otherwise dispose of it. Furthermore, the OSI did not have anyone watching the trailer or English. When English left the OSI, he was free to pursue his own devices. Indeed, he was even free to do nothing. But he approached Kirby and told him he had better bring the property back because the OSI knew he had the items. This was a true statement. The only thing English did not tell Kirby was that he told the police he would try to persuade him to return the property. We think it is significant that English did not ask Kirby if he stole the property, nor did he try to elicit any other details. He simply informed Kirby that the OSI knew he had the items, but he in no way prevented Kirby from being free to do nothing, to consult a lawyer for advice, to dispose of the property, or to return it. We find nothing in the conversation between English and Kirby which placed any obligation on Kirby to return the property. English was acting entirely for his own benefit to clear himself from suspicion of this theft, especially since he was soon due for separation from the service. Indeed, we find very significant what occurred after English requested to consult with an attorney but was told none was available at that time, which was true. After he said he would like to

tell the agent something, the following colloquy occurred:

Reid: I'm sorry, I can't ask you any other questions because you've asked for an attorney. I don't want to violate your rights, because you are exercising your rights.

English: I want to go ahead and tell you something.

Reid: At this time, then, are you going to waive your rights and go ahead and talk to us?

English: Yes, sir, I am.

Reid: Well, you don't want an attorney at this time?

English: No. I'll see one later. Right now I want to go ahead and tell you something.

Reid: Okay. What do you want to tell me?

Then followed his offer, according to Agent Reid: "[H]e told us if we would let him go out there he would try to talk the individual into bringing the equipment back. He said he didn't know whether he could or not but he would attempt to."

Thus, the OSI was not just lying in wait for someone to help them, nor did they even hint at that. It was English who insisted on volunteering after the OSI had exhibited scrupulous respect for English's rights.

What the OSI did in essence was to tell English he could do as he chose. We can envision serious constitutional problems which could arise if the OSI had kept English in custody or had given him an order not to talk to Kirby about the property. Thus, we decline to require that law enforcement officials take steps to prevent citizens from acting as English did, which in reality merely amounted to advising his friend and roommate what the OSI knew, and then suggesting the obvious. But he left the ultimate decision to Kirby, who acted in order to avoid what he conceived to be the inevitable, namely that a search could take place. English did not even tell Kirby that if he did not return the items, he would go to the OSI. We are aware that the OSI believed that they did not have

probable cause to search. But they never sought a judicial determination of that matter. In fact, they had an informant who had seen the property in question. We cannot be sure that he would not at least have given a signed statement to that effect if told that was necessary, and he may even have agreed to appear in person before a magistrate. We consider that under these circumstances, there is at least a reasonable likelihood that probable cause to search would exist. Therefore, Kirby's perception was not obviously wrong.

We do not choose at this time to set forth a comprehensive statement of the precise characteristics of officiality where the other party is not a person known to the accused as a law enforcement agent or a superior. Suffice to say that we are satisfied as a matter of law that the evidence is insufficient to support the finding of the Court of Military Review that English was acting in an official capacity. Accordingly, the first certified question is answered in the negative. This removes the need to answer the second question.

The decision of the United States Air Force Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for reference to that court for further review.

Chief Judge FLETCHER concurs in the result.

COOK, Judge (concurring in the result):

This Court's authority to review findings of fact by the Court of Military Review is limited to determination of whether sufficient evidence supports those findings essential to the decision. *United States v. Anderson*, 1 M.J. 246 (C.M.A.1976). My reading of the record inclines me to conclude that sufficient evidence supports the Court of Military Review's determination that English was acting at the behest, and in furtherance, of the OSI agents' investigation. But even if I err in that regard, I am impelled to answer the first certified question in the negative because English's conduct was not within "the ambit of Article 31[b]," Uniform Code of Military Justice, 10 U.S.C. § 831(b).

The principal opinion leaves undisturbed, and, therefore, binding upon the Air Force,[1] the Court of Military Review's holding that Article 31(b) requires an informant, who agrees to assist in a criminal investigation, to advise anyone whom he suspects is involved in the crime being investigated and whom he proposes to talk to about the offense that he has a right to remain silent. In my opinion, that holding is contrary to our cases and should not be allowed to stand.

In *United States v. Gibson*, 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954), the Court was faced with a contention that Article 31(b) warnings were required where an informant was placed in confinement with the accused. Chief Judge Quinn observed the following:

Taken literally, this Article is applicable to interrogation by all persons included within the term "persons subject to the code" as defined by Article 2 of the Code, supra, 50 U.S.C. § 552, or any other who is suspected or accused of an offense. However, this phrase was used in a limited sense. In our opinion, in addition to the limitation referred to in the legislative history of the requirement, there is a definitely restrictive element of officiality in the choice of the language "interrogate, or request any statement," wholly absent from the relatively loose phrase "person subject to this code," for military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime. See *United States v. Wilson and Harvey*, 2 U.S.C.M.A. 248, 8 C.M.R. 48. This is not the sole limitation upon the Article's applicability, however. *Judicial discretion indicates a necessity for denying its application to a situation not considered by its framers, and wholly unrelated to the reasons for its creation.*

1. *See* my separate opinion in *United States v. Ledbetter*, 2 M.J. 37, 52 (C.M.A.1976).

*Id.* at 752, 14 C.M.R. at 170 (emphasis added). On the basis of the foregoing analysis, the author concluded that Article 31(b) warnings were not required because that article was not applicable to a situation where there was no coercive element of superior rank or official position.

Judge Brosman concurred with the following remarks:

Once having committed myself to the notion of interpreting Article 31(*b*) in this manner, I am compelled to accept the result offered by the Chief Judge—since I am convinced that Congress was concerned principally with the possibility of implied coercion due to military discipline and superiority, rather than with suppressing the use of statements obtained through trickery.

*Id.* at 753–54, 14 C.M.R. at 171–72. In rejecting Judge Latimer's dissent, he noted the following:

The necessity for regarding Article 31(*b*) as having been designed to provide a counteragent for possible intangible "presumptive coercion," implicit in military rank and discipline, is suggested by the background in which it was framed. Cf. *United States v. Franklin*, 8 C.M.R. 513. Moreover, that it should be limited to that purpose is a conclusion compelled by the dangers latent in the approach proposed by Judge Latimer. In the first place, this interpretation will inescapably deny admissibility to statements obtained by investigative agents who are "planted" in criminal locales in the hope that they may obtain information concerning suspected offenses. *Any question put by such an agent would necessarily require a prefatory warning in order to insure compliance with Article 31(b)—a warning which, in some instances, might prove fatal to the person expressing it.* An informer's disclosures would likewise be inadmissible in trials by court-martial if those disclosures were secured through the direction of inquiries to persons suspected of offenses. In instances of continuing conspiracy for illicit purposes, such as drugpeddling or theft of Government property, it would seem that in-formers, or other persons utilized as decoys, would be unable to elicit disclosures of inculpatory information, of even the utmost voluntariness, without prior warning.

*Id.* at 755, 14 C.M.R. at 173 (emphasis added).

Subsequently, in *United States v. Hinkson*, 17 U.S.C.M.A. 126, 37 C.M.R. 390 (1967), the Court concluded that Article 31(b) warnings were not required where the accused was confronted in the waiting room of the Office of Naval Intelligence (ONI) by a man who, unknown to the accused, was working for an ONI agent. In *Hinkson*, the majority cited *Gibson* with the following comment:

Long ago we held that the Article 31 requirement that an accused or suspect not be interrogated or requested to make a statement without first being advised of his right to remain silent, does not apply to an undercover agent who merely engages in ordinary conversation with an unwary suspect.

*Id.* at 127, 37 C.M.R. at 391. Judge Ferguson dissented on the basis:

That the Government may plant an informer in criminal councils and thereafter use statements made by an accused to him or in his presence is undoubtedly true. *Hoffa v. United States*, 385 U.S. 293, 17 L.Ed.2d 374, 87 S.Ct. 408 (1966); *Osborn v. United States*, 385 U.S. 323, 17 L.Ed.2d 394, 87 S.Ct. 429 (1966). But, in my view, the Government's privilege to do so must end when the accused is taken into custody or otherwise subjected to interrogation as a suspect.

*Id.* at 129, 37 C.M.R. at 393.

*Hinkson* is not cited for the contention that while an informant may engage a suspect in "conversation," he may not ask any questions. Indeed, the record in *Hinkson* reflected that no questions were asked by the informant. However, the conclusion that an informant must advise a suspect of his Article 31(b) rights prior to asking questions is contrary to the precedents and practice of this Court. As previously noted,

*Gibson* was cited with approval in *Hinkson*, and the incriminating statements in *Gibson* were in response to the question, "What are you in for?" *United States v. Gibson, supra* at 753, 14 C.M.R. at 171. No doubt such a question was designed to elicit an incriminating response. In most instances, normal "day-to-day" conversations between individuals involve some questions. Accordingly, I do not interpret the language of *Hinkson* as precluding the asking of questions by an informant or undercover agent without Article 31(b) warnings, although *Hinkson*, in fact, involved a situation where no questions were asked.

To interpret Article 31(b) as requiring warnings by an informant or undercover agent ignores the basis of this Court's opinions in *Hinkson* and *Gibson*, which recognized that the intent of Congress in enacting Article 31(b) was to dispel the inherently coercive nature of superior-subordinate relationships in the military, and the absence of this coercive element where an informant or undercover agent was involved. This Court has reviewed many cases in which an informant or undercover agent was employed without any examination of the nature of the conversation between the accused and the agent or informant. *See United States v. Gladue*, 4 M.J. 1 (C.M.A.1977); *United States v. O'Berry*, 3 M.J. 334 (C.M.A.1977) (reversed on other grounds); *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977) (reversed on other grounds); *United States v. Waller*, 3 M.J. 32 (C.M.A.1977); and *United States v. Bryant*, 3 M.J. 9 (C.M.A.1977) (reversed on other grounds). Obviously, the most likely question during any negotiation between an informant and an accused during a "controlled" purchase is whether the accused has any contraband for sale. Until today, this Court has never even hinted, directly or indirectly, that such negotiations must be preceded by Article 31(b) warnings. Indeed, I share the concern expressed by Judge Brosman that such a warning "might prove fatal to the person expressing it." Thus, while English may have been acting in an official capacity in the sense that he was acting for the OSI, I would adhere to the prior decisions of this Court which do not require that Article 31(b) warnings be given a suspect by an informant or undercover agent.

In *United States v. Dohle*, 1 M.J. 223 (C.M.A.1975), Chief Judge Fletcher announced a new construction of Article 31(b) which requires a warning where the interrogator, who is subject to the Uniform Code, occupies a position of authority over an accused and such accused is aware of that position. In my opinion, the concept of "position of authority" does not require Article 31(b) warnings under the circumstances of the present case where an accused is confronted by his roommate, who occupies no position that could in any manner, coerce the appellant into an incriminating act.

Accordingly, I would answer the first certified question in the negative because the situation in which English talked to the accused was not within the ambit of Article 31(b). I join in reversing the decision of the Court of Military Review and in returning the record to it for further proceedings.