**UNITED STATES, Appellee,**

v.

**Dennis J. DUGA, Airman First Class, U. S. Air Force, Appellant.**

Dkt. No. 37919/AF.
CMR Dkt. No. 24700/S.

U. S. Court of Military Appeals.

Jan. 26, 1981.

For Appellant: *Major Wade B. Morrison* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Lieutenant Colonel Bruce R. Houston* (argued); *Colonel James P. Porter, Captain James R. Van Orsdol, Colonel Michael Levant,* and *Captain William O. Ashcraft,* a law student who assisted in preparation of the brief (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried by a special court–martial with members on November 20–22,

1978, at Lowry Air Force Base, Colorado, and was convicted of larceny of a canoe which he stole from the recreational vehicle storage area on base.[1] He was sentenced to a bad–conduct discharge, confinement at hard labor for 3 months, forfeiture of $279.00 pay per month for 3 months, and reduction to the grade of Airman Basic. The convening authority approved the sentence. Thereafter, the United States Air Force Court of Military Review affirmed the appellant's conviction after it concluded that certain pretrial admissions made by the appellant to a policeman–friend had not been obtained in violation of Article 31(b).[2] *United States v. Duga*, 7 M.J. 891 (A.F.C.M. R.1979). We subsequently granted review on this same question of law. (8 M.J. 133).

## I

On the morning of August 7, 1978, Mr. Bruce, a special agent of the Office of Special Investigations (OSI), questioned Airman Byers, who was a security policeman, about anything he knew which connected the appellant to certain thefts the OSI was investigating. After Byers gave him a "statement . . . of everything [he] knew," Bruce told him that "if [he] could give him any more information, it would be of help to him." Byers replied, "If anything comes up, I'll see what I can do."

On the evening of August 7, Byers was posted on security police duty at one of the base gates when the appellant rode up to the gate on a bicycle. He began to chat with the appellant–first asking him "How's it going?"–and then they "just talked a little bit about various things." As Byers explained how this conversation commenced, "he was the only one there and it was kind of a long night. It was kind of nice to have somebody around to talk to." He had known the appellant for approximately a year and a half, and the two of

them had lived and consorted in the same military dormitory and had "go[ne] out socially . . . together" during the evenings. Moreover, both of them were Airmen First Class, and were assigned to the same security police squadron.[3] And since he was curious about rumors he had heard concerning "things that had been happening and [because] he just kind of wondered whether he had been [left] in the dark about it," he asked the appellant "what he was up to." Duga responded that he was looking for a place to hide his van because the OSI was looking for it and that he still had something in it. Byers then asked the appellant "what was the deal that was going on back when he was on leave?" The appellant stated he had been caught with a canoe and chain saw, which he later admitted had been stolen from the base. No Article 31(b) warning had preceded any of the questions asked by Byers.

On the night of August 8, Byers "had another conversation with Duga and some other people in the room." This conversation apparently occurred in the dormitory, where the appellant further discussed his criminal involvement.

On August 10, Byers "voluntarily" went back to OSI and reported the substance of the conversations he had had with the appellant at the gate and "in the room." Charges were eventually preferred against the appellant for larceny of a canoe and chain saw.

At the appellant's court–martial, defense counsel moved to prevent Byers from testifying to any inculpatory statements that Duga had made to him. He argued that Byers should have warned the appellant of his Article 31(b) rights before questioning him about the canoe.

During the evidentiary hearing held on this objection, only Byers testified. He de-

---

1. This conduct constituted a violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921. The appellant was acquitted of larceny of a chain saw which he allegedly had stolen from the base.

2. UCMJ, 10 U.S.C. § 831(b).

3. Even though the appellant and Byers were assigned to the same security police squadron, the appellant had not worked as a security policeman for several months due to his involvement in the offenses charged.

nied that he questioned the appellant while acting officially as a security policeman and insisted that their conversation was only "more or less buddy–to–buddy talk you might say." Upon further inquiry by the military judge, Byers repudiated that "OSI had asked [him] to go ahead and find out anything [he] could"; he said that OSI merely stated "that if [he] could find anything out for them, it would be helpful and to give the man [he] talked to a call." He then maintained that his purpose in questioning the appellant was not to find out information for the OSI. Again, he averred that he was "speaking more or less like a friend to a friend" and "[j]ust out of my own curiosity." Finally, he told the military judge that at the time the conversation took place, "[he] never really thought about" what he would do with the information he learned from the appellant.

After listening to Byers' testimony, the military judge denied the defense motion to prevent him from giving evidence of the appellant's incriminating pretrial admissions. Subsequently, Byers testified on the merits and, largely due to his testimony, the appellant was convicted of larceny of the canoe.

The appellant also contended before the United States Air Force Court of Military Review that his pretrial admissions were inadmissible because Byers had not prefaced his questions with Article 31(b) advice. However, as stated earlier, that Court held against the appellant. It found that Byers was not an OSI informant and that the OSI had not asked him to question the appellant. "Their request, to report any additional information he received, was nothing more than a request to do what any good citizen should do." Additionally, the Court found "that Byers' conversation with the accused was solely personal and that the questions asked were prompted only by his desire to satisfy his own curiosity." *United*

*States v. Duga, supra* at 895. Therefore, Byers had not acted officially in obtaining his information and, thus, the military judge had properly received the incriminating statements as evidence.

■ Before us the appellant makes the same appeal. He contends that, since at the time of questioning Byers was performing law enforcement duties, which required him to interview witnesses and obtain statements from those suspected of having committed crimes against the Uniform Code of Military Justice, and since Byers had been specifically requested by military authorities to provide information relevant to the investigation of the appellant, he was acting in an official capacity, which required the prefatory warnings.[4] We still disagree.

## II

Article 31(b) provides in pertinent part:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court–martial.

Of course, if this codal provision is applied literally, we would have to hold that the questioning of the appellant by Byers came within the interdiction of the Article, since it is clear that he was a "person subject to this chapter" interrogating someone whom he "suspected of an offense." However, long ago in *United States v. Gibson*, 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954), this Court concluded, after a careful study of the Article's purpose and legislative his-

---

4. In this case, there is no question that the appellant's Fifth and Sixth Amendment rights were not violated, since there clearly was no "custodial interrogation" of the appellant, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and since the questions by Byers did not interfere with the appellant's right to counsel, *see United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Indeed, at the time the appellant was questioned, he had not established a relationship with counsel.

tory, that Congress did not intend a literal application of that provision:[5]

Taken literally, this Article is applicable to interrogation by all persons included within the term "persons subject to the code" as defined by Article 2 of the Code, supra, 50 USC § 552, or any other who is suspected or accused of an offense. However, this phrase was used in a limited sense. In our opinion, in addition to the limitation referred to in the legislative history of the requirement, there is a definitely restrictive element of officiality in the choice of the language "interrogate, or request any statement," wholly absent from the relatively loose phrase "person subject to this code," for military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime. See *United States v. Wilson and Harvey*, 2 USCMA 248, 8 CMR 48. This is not the sole limitation upon the Article's applicability, however. Judicial discretion indicates a necessity for denying its application to a situation not considered by its framers, and wholly unrelated to the reasons for its creation.

Careful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self incrimination. Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command. A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent. Under such circumstances, we do not hesitate to reverse convictions whenever the accused has been deprived of the full benefit of the rights granted him by Congress. See *United States v. Wilson and Harvey, su-*

*pra; United States v. Rosato*, 3 USCMA 143, 11 CMR 143. By the same token, however, it is our duty to see to it that such rights are not extended beyond the reasonable intendment of the Code at the expense of substantial justice and on grounds that are fanciful or unsubstantial.

*Id.* at 752, 14 C.M.R. at 170. Thus, as Judge Brosman summed it up in *Gibson* :

It may be reasonably inferred [then] that Congress did not consider a warning to be a *sine qua non*, but rather a precautionary measure introduced for the purpose of counteracting the presence of confinement, or other circumstances [of "presumptive coercion," implicit in military discipline and superiority], which might operate to deprive an accused of his free election to speak or to remain silent.

*Id.* at 754, 14 C.M.R. at 172.

More recently, in *United States v. Armstrong*, 9 M.J. 374, 378 (C.M.A.1980), the Court again observed that

The purpose of Article 31(b) apparently is to provide servicepersons with a protection which, at the time of the Uniform Code's enactment, was almost unknown in American courts, but which was deemed necessary because of subtle pressures which existed in military society. *See* Index and Legislative History, Uniform Code of Military Justice, Hearings Before a Subcommittee of the Committee on Armed Services, House of Representatives, 81st Cong., 1st Sess., H.R. 2498, pp. 984–85 (1949). Conditioned to obey, a serviceperson asked for a statement about an offense may feel himself to be under a special obligation to make such a statement. Moreover, he may be especially amenable to saying what he thinks his military superior wants him to say— whether it is true or not. Thus, the serviceperson needs the reminder required under Article 31 to the effect that he need

---

**5.** As Judge Cook noted in *United States v. Kelley*, 8 M.J. 84, 85 (C.M.A.1979) (Summary Disposition), "For the quarter of the century that the Uniform Code has been in force, this Court has eschewed a literal construction of

[the Article 31(b)] language." *But see United States v. Seay*, 1 M.J. 201, 205 (C.M.A.1975), where Judge Ferguson wrote that he "would apply the literal language of Article 31."

not be a witness against himself. *See id.* at 990. To paraphrase a remark by Mr. Justice Stewart in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), "[t]he concern of the [Congress] in [enacting Article 31(b)] was that the 'interrogation environment' created by the interplay of interrogation and [military relationships] would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory incrimination" contained in Article 31(a) of the Uniform Code of Military Justice.

■ Therefore, in light of Article 31(b)'s purpose and its legislative history, the Article applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry. *United States v. Gibson, supra.* Accordingly, in each case it is necessary to determine whether (1) a questioner subject to the Code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation. *United States v. Gibson, supra.* Unless both prerequisites are met, Article 31(b) does not apply.[6]

Thus, in *Gibson,* the Court observed that Gibson's:

statement was made to a fellow prisoner in the course of a conversation between equals. It followed upon the very usual question, "What are you in for?" No one could reasonably infer from any of the surrounding circumstances that the accused was placed in such a position as to compel a reply to questions asked by Ferguson. The voluntariness of his statement is beyond question.

*Id.* at 753, 14 C.M.R. at 171.

In *United States v. Dandaneau,* 5 U.S.C. M.A. 462, 18 C.M.R. 86 (1955), it appeared that at a chance meeting the accused voluntarily made some inculpatory statements "on more or less a personal basis" to a friend of his who was an officer. In light of this situation, we held that despite the absence of preliminary warning, the pretrial statements were admissible and observed:

Not every inculpatory statement made by an accused in conversation with another is inadmissible because of a failure to warn him of his rights under Article 31. The prohibition of the Article extends only to statements elicited in the course of official interrogation. United States v. Gibson, 3 USCMA 746, 14 CMR 164. It is essential, therefore, to determine whether the question asked by Captain Lucas, when he first met the accused in the squadron office, is, as a matter of law, so clearly official or so demanding of an answer by virtue of his superior rank as to fall within the interdiction of the Uniform Code.

Captain Lucas' own motivation was entirely personal. The record is silent as to the light in which the accused regarded the conversation. It is also silent as to whether he knew that Captain Lucas was the commanding officer of the unit to which he was to be assigned. However, from the informality of the conversation and the place it occurred, it may be inferred that he too regarded the encounter as a casual meeting.

*Id.* at 464–65, 18 C.M.R. at 88–89.

Then, recently in *United States v. Kirby,* 8 M.J. 8 (C.M.A.1979), the Court concluded that the questioner (English) had not been acting officially and so was not required to give an Article 31(b) warning. He had been interviewed by an OSI agent about stolen property reported to have been seen in a trailer shared by him, his wife and the accused. Though he denied having taken

---

6. The "position of authority" test relied on in *United States v. Dohle,* 1 M.J. 223 (C.M.A. 1975), is concerned with the state of mind of the accused or a suspect, as affected by any perceived position of authority in the military held by the questioner, and, secondly, with whether the questioning is part of an ongoing investigation, in which the questioner's obligation is to obtain a statement from a suspect bearing upon the subject of the investigation. *Cf. United States v. Kirby,* 8 M.J. 8 (C.M.A. 1979). Neither prerequisite is present in this case.

any part in the theft, he asked the agent for permission to persuade the accused, his roommate, to surrender the property to OSI since the accused was in possession of the stolen property. When he accosted the accused at their trailer, he told him that OSI knew he had the stolen items. Later that day the accused and English returned the stolen items to OSI. However, there simply was no coercion implicit in these facts, which would have required English to advise his roommate of Article 31(b) rights before they had returned the items to OSI. *See United States v. Beck*, 15 U.S.C.M.A. 333, 35 C.M.R. 305 (1975); *but cf. United States v. Souder*, 11 U.S.C.M.A. 59, 28 C.M.R. 283 (1959).[7]

### III

In the case at hand, the evidence only permits the conclusion reached by the Air Force Court of Military Review that the questioning of appellant by Byers did not fall within the purview of Article 31(b). The two prerequisites which determine whether Article 31(b) warnings were required are not met in this case. As found by the Court of Military Review, the record reveals that the questioning was not done in an official capacity—that is, Byers was not acting on behalf of the Air Force—either as a security policeman or as an agent of the OSI. Since the appellant declined to present any evidence on the issue, *cf. United States v. Beck, supra* at 339, 35 C.M.R. at 311, Byers' testimony is completely uncontroverted as to their camaraderie and affiliation in the same security police squadron, and his statement that when the appellant rode up to the gate on his bike, he was only "speaking [to him] more or less like a friend to a friend," or, as elsewhere described by

him—it was "more or less like—buddy—to—buddy talk you might say." No evidence contradicts the inference that the questioning by Byers was solely motivated by his own personal curiosity and was entirely unconnected with his previous contact with the OSI. In any case, in what the OSI told Byers, it neither directed nor advised him to question the appellant. In view of the uncontradicted nature of the testimony, we have no choice but to uphold the lower court's finding of a lack of the officiality which is essential to requiring the Article 31(b) warning.

Even if the officiality prerequisite had been met, the evidence is undisputed that the appellant could not possibly have perceived his interrogation as being official in nature. The evidence portrays a casual conversation between comrades, in which the appellant voluntarily discussed with Byers his general involvement in crime, as well as his current plight. Apparently boasting, the appellant was telling his friend that "[h]e knew how to get into most buildings on the base"; among other things, he had stolen from the base a canoe, trailer and chain saw. He even felt comfortable enough to tell Byers that he was looking for a place to hide his van because he had something in it and the OSI was looking for it. Certainly, had he perceived that Byers was questioning him as a security policeman, or had he known that Byers had spoken to the OSI, he would not have told Byers that he was looking for a place to hide his van, because he had contraband in it and the OSI was looking for the van. Equally significant, on the following day the appellant even had another conversation with Byers and "other people in the

---

7. *United States v. Souder*, 11 U.S.C.M.A. 59, 28 C.M.R. 283 (1959), seems irreconcilable with the approach which the Court has usually taken in resolving Article 31(b) problems. There, a naval lieutenant on active duty, who also owned and operated a music store near the naval station, was working in his business when he obtained inculpatory admissions from the accused who was trying to sell him a stolen accordion. Since he was out of uniform, there apparently was no way the accused could have known that he was a naval officer. However, the Court held that the accused's inculpatory statements could not be received into evidence without interposition of the Article 31(b) warning, since the officer had interrogated the accused for the purpose of obtaining inculpatory admissions while knowing the instrument had been stolen from another service member.

room," where again Duga apparently incriminated himself. Thus, the appellant could not have envisioned that Byers was acting in an official capacity. Moreover, there was no subtle coercion of any sort which could have impelled the appellant to answer Byers' questions. Here, the appellant was himself a security policeman;[8] and, as Byers stated, the appellant even "outranked" him. Therefore, there is nothing in this case which calls for the application of Article 31(b). It follows that the appellant's incriminating statements were properly before the court despite the absence of a preliminary warning.

## IV

The decision of the United States Air Force Court of Military Review is affirmed.

Judge FLETCHER concurs.

COOK, Judge (concurring in the result).

I concur in the result. *See* my separate opinion in *United States v. Kirby*, 8 M.J. 8, 11 (C.M.A.1979).

---

8. The appellant's defense counsel also argued a related motion at the Article 39(a), UCMJ, 10 U.S.C. § 839(a) session, where he contended that a member of the Enfield, Connecticut, Police Department had interrogated the appellant in violation of his *Miranda* rights. The Enfield policeman had gone to appellant's house after an agent from the base had reported to the police that they suspected the appellant had in his possession property he had taken from the base. Significantly, when the appellant testified in support of this motion, he acknowledged that he knew his *Miranda* rights–that is, he knew he had a right to remain silent and not to make statements to the police. As a security policeman himself, he carried a "rights card" to advise other suspects. Thus, the appellant knew that, if he did not want to, he did not have to answer any of Byers' questions.