## UNITED STATES

v.

**Airman Timothy S. STROUD, FR 455–37–8583, United States Air Force.**

### ACM 26511.

U.S. Air Force Court of Military Review.

Sentence Adjudged 11 Nov. 1987.

Decided 2 Dec. 1988.

---

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Captain Laurence M. Soybel.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Lieutenant Colonel Robert E. Giovagnoni and Lieutenant Colonel Morris A. Tanner, Jr.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

## DECISION

BLOMMERS, Judge:

The appellant was charged with desertion terminated by apprehension and missing movement by design. He entered pleas of not guilty to the offenses charged, but guilty to an absence without authority (AWOL) terminated by apprehension, a lesser included offense under the desertion charge. Electing trial by judge alone, he was found guilty of the unauthorized absence terminated by apprehension pursuant to his pleas, and also found guilty of missing movement as charged. The sentence, as adjudged and approved, extends to a bad conduct discharge, seven months confinement, forfeiture of $150.00 pay per month

for seven months, and reduction in grade to airman basic (E–1).

After graduating from technical training school (as an aircraft armament systems specialist) at Lowry Air Force Base, Colorado, the appellant completed his out-processing pursuant to permanent change of station (PCS) orders, signed out of his unit, and departed the base on 8 May 1987. He was granted leave enroute. Pursuant to a Military Airlift Command (MAC) Transportation Authorization, he was scheduled for "Category Y" type travel to his new duty station overseas (Torrejon Air Base, Spain) aboard Trans World Airlines flight number T904Y departing John F. Kennedy International Airport, New York, on 3 June 1987.[1] Although unclear from the record, we will presume that he was responsible for making his own travel arrangements to the point of debarkation, JFK International. On 15 May 1987 the appellant got married. He did not report for his flight overseas as scheduled on 3 June. Instead, he and his wife moved to Las Vegas, Nevada, where he was apprehended some three months later. He was returned to Lowry AFB on 20 October 1987 and placed into pretrial confinement. At first he was segregated from the rest of the prisoners, but after four days he was placed with the general prison population, the vast majority of whom, we can presume, were post-conviction prisoners. The appellant has asserted three errors. We will address them in order, together with one additional matter which arose at trial.

## I

APPELLANT'S PLEA OF GUILTY TO BEING AWOL FROM LOWRY AFB, COLORADO, WAS IMPROVIDENT IN THAT HE HAD NO LEGAL OBLIGATION TO RETURN TO THAT BASE.

■ The appellant relies principally on *United States v. Pounds*, 23 U.S.C.M.A. 152, 48 C.M.R. 769 (1974), which held, in

---

1. Air Force Regulation 75–8, *Movement of Personnel,* Volume I, para. 5–16 (22 March 1979) defines Category Y travel as follows:

   Category Y traffic is the movement of DOD sponsored passengers by regularly scheduled

air carriers over their commercial routes.... This airlift is bought on a roundtrip basis and no less than 20 seats must be used by MAC on each flight.

essence, that once a service member has received orders to report to another base on a date certain, he no longer had any duty to remain at or return to his previous base of assignment. *See also United States v. Rosen,* 45 C.M.R. 728 (A.F.C.M.R. 1972). In other words, after 3 June 1987, the date of the alleged missed movement and commencement date of the period of unauthorized absence, he was "absent from the place at which his orders required him to be" (his unit in Spain), not from his previous unit at Lowry AFB, the unit set forth in the desertion specification. *United States v. Pounds,* 48 C.M.R. at 770. We also note that the Manual for Courts-Martial, in discussing the offense of absence without leave, provides: "A person undergoing transfer between activities is *ordinarily* considered to be attached to the activity to which ordered to report." MCM, Part IV, para. 10 c(7) (1984) (emphasis added). Nevertheless, we conclude that there is no fatal variance between the charge and the proof in this case, and that the appellant's plea of guilty to an unauthorized absence from Lowry AFB was provident.

The Court in *Pounds* noted that Air Force strength accountability procedures provided "that 'on paper' the losing unit will retain responsibility for the accused on its morning report until a stated effective date of change in strength reporting has passed" (a date half way between the time an individual signs out from his losing unit and is to report to his gaining unit). *Id.* at 770. It concluded, however, that this was merely a records keeping device "used to insure that each member is accounted for by *only one unit at a time.*" *See* Air Force Manual 35–15, *Military Personnel Strength Accounting Methods,* para. 2–3 (23 September 1970). Subsequently, Air Force personnel procedures were changed to specifically cover accountability for members who absented themselves during the course of a PCS move. The regulation in effect at the inception of the appellant's absence provided: "If the absence began while the member was in PCS travel status from CONUS to an overseas base and the member returns to a CONUS base other

than the port of embarkation regardless of the length of the absence ... then the disposition is return to the losing unit." Air Force Regulation (AFR) 35–73, *Desertion and Unauthorized Absence,* Table 2, Rule 7 (3 December 1979) (A new regulation published on 1 July 1987 and in effect on the date of the appellant's trial, as well as the previous 1975 version, contain a similar provision). Interpreting this personnel rule, this Court has stated:

> █t was clearly the intention of the drafters of the regulation to provide for the continued assignment to the losing organization until actual acquisition by the gaining organization, in order to avoid the kind of problems that had arisen in unauthorized absences during transfers under the former reporting procedures. *See United States v. Johnson,* 45 C.M.R. 604 (A.F.C.M.R.1972) and the reconsideration of the same case by this Court reported at 45 C.M.R. 607.

*United States v. Walker,* 2 M.J. 253, 255 (A.F.C.M.R.1976), *aff'd* 4 M.J. 276 (C.M.A. 1978). Although factually distinguishable, the rationale set forth in *Walker* is certainly applicable to the case at bar. The appellant was properly charged with being absent from Lowry AFB. Additionally, on several occasions during the inquiry into his guilty plea, the appellant acknowledged that the unit set forth in the specification was officially his unit and that he was absent from that unit without authority. Thus there is a factual as well as legal basis for affirming the findings of the trial court.

## II

AIRLINE TICKETS PURCHASED UPON A COMMERCIAL AIRLINER FOR MILITARY PERSONNEL TO TRAVEL OVERSEAS DO NOT CONSTITUTE A MOVEMENT FOR THE PURPOSE OF ARTICLE 87, UCMJ, 10 U.S.C. § 887.

█ The offense of "missing movement" with an increased penalty was drafted into a specific punitive article following World War II when experience taught that a large number of military personnel "failed

to show when *their* units or ships moved as such, perhaps to combat or forward areas. The seriousness of the offense results from the disruption of the scheduling and movement of an integrated, cohesive, perhaps self-sufficient and interdependent group of military men that may well have trained to perform as a unit." 81st Cong., 1st Sess., on S. 857 and H.R. 4080 at 37. Early cases by and large limited application of the offense to situations where the movement of units or groups of military personnel were involved. *See, e.g., United States v. Jackson,* 5 C.M.R. 429 (A.F.B.R.1952); *United States v. Burke,* 6 C.M.R. 588 (A.F.B.R. 1952). Since then, application of the offense has been broadened to cover the movement of individual servicemembers, it having been recognized that, absent large-scale training exercises or emergencies requiring the immediate presence of a large force, this is the most common method of movement—moving individuals to a unit rather than moving the unit itself. *See United States v. Graham,* 16 M.J. 460, 464 (C.M.A.1983). *See also United States v. Johnson,* 3 U.S.C.M.A. 174, 11 C.M.R. 174 (1953); *United States v. St. Ann,* 6 M.J. 563 (N.C.M.R.1978), *pet. denied,* 7 M.J. 392 (C.M.A.1979).

Our Court last addressed what constitutes a movement under UMCJ Article 87 in a case decided over eight years ago, *United States v. Monod de Froideville,* 9 M.J. 854 (A.F.C.M.R.1980), *pet. denied,* 10 M.J. 189 (C.M.A.1980). It was held that an accused could be convicted of missing movement where he was twice assigned a seat aboard a military charter aircraft pursuant to a duly directed change of assignment and, demonstrating his intention not to go to Korea at all, he twice, through design, missed his flight.

The present Manual for Courts–Martial, in discussing mode of movement, makes specific reference to movement of a unit *and* movement of individuals as passengers aboard ships or aircraft. MCM, Part IV, para. 11 c(2) (1984). With respect to movement of individuals it provides: "If a

person is assigned as a crew member or is ordered to move as a passenger aboard a particular ship or aircraft, military or chartered, then missing the particular sailing or flight is essential to establish the offense of missing movement." *Id.* at para. 11 c(2)(b).

The most recent decisions from the Court of Military Appeals concerned with the movement of persons rather than units establish the following precedent. In *United States v. Graham,* the accused, proceeding individually on PCS orders from Germany to the United States, had a reserved seat on board *a specific* MAC flight. He admitted that he intentionally missed the flight. The Court of Military Appeals upheld his conviction for missing movement, noting that the disruption to military operations was sufficient to bring the misconduct within the ambit of Article 87. The Court noted, however, that such a result would not necessarily be reached "in a situation where the serviceperson is merely given a commercial transportation request and told to report at some time in the future." *Id.* at 464.

In *United States v. Gibson,* 17 M.J. 143 (C.M.A.1984), the accused, having returned from an unauthorized absence, was given a ticket and orders to report for a commercial flight from Philadelphia to Norfolk, Virginia. He failed to make the flight, which was scheduled to depart at 0910 hours. The Court held:

> We may surmise that the Navy would have been satisfied had the accused caught any flight from Philadelphia that would have returned him to Norfolk on that day. In any event, the 'foreseeable disruption' to naval operations caused by his failure to make the particular flight is not of such magnitude as to require the more severe punishment afforded by the application of Article 87.

*Id.* at 144.[2] *See also United States v. Gillchrest,* 50 C.M.R. 832 (A.F.C.M.R.1975).

---

**2.** This year, the Court did issue a decision in a case where the accused was transferred overseas with his unit, but was authorized to travel separately. His conviction for missing movement was upheld. *United States v. Smith,* 26 M.J. 276 (C.M.A.1988).

■ In the case now before us, appellant defense counsel urge us to conclude that the situation we face is more akin to *Gibson* than it is to *Graham*. We decline to do so. Here the appellant was issued a ticket (MAC Transportation Authorization) for a specific flight, on which the government had purchased a block of seats. Further, his orders required that he report to his gaining unit immediately upon his arrival in the overseas area. The destination of the flight was Madrid, Spain.[3] With respect to a "movement" in today's military environment, we cannot disagree with the rationale and conclusion reached recently by the Army Court of Military Review in a similar case, *United States v. Blair*, 24 M.J. 879 (A.C.M.R.1987), *pet. granted* 26 M.J. 53 (C.M.A.1988). In *Blair*, the Court found that as to the mode of movement of servicemembers, there is no meaningful distinction between "military," "chartered" or "commercial" flights when the military provides or purchases seats on specific flights and orders its personnel to board those flights for travel to a new duty station. The Army Court further concluded:

> Whether the movement in question was urgent or whether the accused has been assigned some essential mission is matter that relates to the foreseeable disruption to the service and so is properly matter in mitigation or aggravation, and not a circumstance that changes the actual commission of the offense.

*Id.* at 880. *See also United States v. Graham*, 16 M.J. at 464. We can not fault this reasoning either, and believe it should be determinative of the issue. However, to the extent that a "foreseeable disruption" to the service is required by *Gibson* to warrant the more severe punishment authorized under Article 87, we conclude that it exists in this case. Although the record is silent as to whether the seat reserved for the appellant went unused, that is a likelihood. Certainly, his failure to report was disruptive to those responsible for making flight arrangements at the point of departure. And, as noted above, the appellant had been trained as an aircraft armament systems specialist, a job we would presume to be of considerable importance to tactical fighter operations in the European theater. Surely the unit vacancy to which he was to be assigned had to be covered by someone else until this situation was resolved. *See United States v. Graham*, 16 M.J. at 464. The application of Article 87 to his misconduct under these circumstances is appropriate.

We premise our decision in this regard upon where we believe the law stands today. This is not to say we are entirely comfortable with the present interpretation of the scope of a "movement" under Article 87 as it pertains to individuals. We foresee potential inequities in the treatment of our servicemembers. A hypothetical case will suffice to illustrate our concern. Airmen A and B receive notices of reassignment to a base in Alaska. Both have the same reporting date. Airman A, who is single, is given a portcall and assigned a seat aboard a specific aircraft. He fails to show up for the flight, thereby missing his reporting date, and is placed in an AWOL status. Airman B, who is married, decides to vacation with his family enroute. His leave request is approved and he is authorized to travel to Alaska in his personally owned vehicle. On the way through Canada, he decides the opportunity to fully explore the beautiful Canadian Rockies is far preferable to getting to his new assignment on time. After failing to meet his reporting date, he is likewise listed as AWOL. The degree of operational "disruption" at their new units in Alaska caused by the failure of these two airmen to report on the date ordered will be presumed to be the same. Both airmen turn themselves in to military authorities within thirty days of their reporting dates. Under this scenario, the following legal outcome does exist. Airman A could be convicted of both missing movement and the unauthorized absence, subjecting him to a maximum punishment including a dishonorable

---

**3.** We take judicial notice of the fact that Torrejon Air Base is located adjacent to the greater metropolitan Madrid area, and that one of the principal missions of the base is to support tactical fighter aircraft operations.

discharge and thirty months confinement if tried by general court-martial. Airman B, on the other hand, could only be tried for the unauthorized absence, would not be subject to a punitive discharge, and could receive at most a sentence including six months confinement. We are certain the Congress never contemplated such a scenerio when Article 87 was enacted, and we doubt such thoughts were entertained by the drafters of our present Manual for Courts–Martial. The question, of course, is: Should the mere fact that Airman A missed a pre-scheduled specific flight during a routine change of assignment be sufficient grounds to subject him to the more severe punishment afforded by prosecution under Article 87? Enough said. Perhaps this would be a fruitful area for study by the Manual's drafters.

### III

WHETHER THE APPELLANT'S COM-MINGLING WITH CONVICTED PRIS-ONERS VIOLATED ARTICLE 13, UCMJ, 10 U.S.C. § 813.

█ That the appellant was placed into the general prisoner population at the Lowry AFB confinement facility is not in dispute. Technical Sergeant Phillips, the correction superintendent, testified that the appellant was initially placed in administrative segregation since he was a pretrial detainee. However, since Air Force regulations permitted pretrial detainees to be placed in the general population, the appellant was so placed as soon as room was available.[4] He then lived on the same bay with sentenced prisoners and watched TV, used the library, played games, went to meals, and participated in physical training with them. However, he was not placed on any work details with sentenced prisoners, other than to do general house-cleaning jobs within the confinement facility. Finally, Sergeant Phillips noted that placement in the general population was much less restrictive than administrative segregation, and that their facility is configured such that pre and post-trial confinees could not be quartered separately unless pretrial prisoners were kept in administrative segregation.

We do not find a violation of Article 13 in this case. There is no indication in the record that the appellant's placement into the general prisoner population was intended in any way as punishment. In fact, the conditions of his restraint were less onerous than if he had continued to be housed separately. All decisions as to where he would be quartered and how he would be employed were in compliance with Air Force confinement directives. Although this issue was raised at trial, there is no indication the appellant made any complaint regarding the conditions of his restraint while he was in pretrial confinement. *United States v. Destefano*, 20 M.J. 347 (C.M.A.1985); *United States v. Palmiter*, 20 M.J. 90 (C.M.A.1985); *United States v. Austin*, 25 M.J. 639 (A.C.M.R.1987); *Thacker v. United States*, 16 M.J. 841 (N.M.C.M.R.1983), *aff'd*, 21 M.J. 83 (C.M.A.1985).

### IV

█ The final matter we will address has to do with a conversation between the appellant and one of the two noncommissioned officers responsible for escorting him from Las Vegas back to Lowry AFB

---

4. The directive in pertinent part provides:

   Prisoners in pretrial confinement [detained], and those in an adjudged or sentenced status, may be quartered in the same bays or cell areas and may use common facilities (such as day rooms).

   \* \* \* \* \* \*

   Any legitimate task that has to be done on an installation, which would ordinarily be assigned to a duty airman, is proper work for a detained, adjudged, or sentenced prisoner. However, prisoners in each status must work separately on details.

   \* \* \* \* \* \*

   Prisoners of all categories may be required to perform routine day-to-day housekeeping and cleaning duties in their own bay, cell, or dormitory areas and in common areas, even though they may be performing these duties at the same time and place in conjunction with prisoners of other categories who are housed in the same place.... Air Force Regulation 125–18, *Operation of Air Force Correction and Detention Facilities*, paras. 2–11a, 2–16a(1) and 2–16a(3) (1 February 1980), respectively.

following his apprehension. The first sergeant of the student squadron to which the appellant had been assigned while at Lowry and a Staff Sergeant Beatty, one of the squadron's Student Training Advisors, were the two sent to escort the appellant. The appellant had been one of Sergeant Beatty's bay chiefs while he was in tech school, so Sergeant Beatty knew him pretty well. While the first sergeant was making their ticket arrangements at the airport in Las Vegas, Sergeant Beatty stated to the appellant, "I just can't believe you missed your flight," or words to that effect. Within seconds, the appellant started relating to Sergeant Beatty what had happened to him. This led to a conversation between the two about the appellant's predicament, although Sergeant Beatty testified he never really asked the appellant any questions. He made the initial statement to the appellant because he was "curious" as to what had happened, although he acknowledged that the appellant may have interpreted it as seeking a response or an explanation.

At trial, defense counsel moved to suppress any admissions made by the appellant because they were made in violation of his right against self-incrimination (Article 31, UCMJ, 10 U.S.C. § 831). Sergeant Beatty did not advise the appellant of his rights under Article 31(b) or his right to counsel. Trial counsel countered that under the circumstances present no rights advisement was required since Sergeant Beatty's motivation was only personal curiosity and the result was mere casual conversation. *United States v. Jones,* 24 M.J. 367 (C.M.A.1987); *United States v. Duga,* 10 M.J. 206 (C.M.A.1981). The military judge so found (he made detailed findings of fact when announcing his ruling, which have been of great assistance to us during our review of this case), and permitted Sergeant Beatty to testify about what the appellant told him. In determining whether unwarned statements can be admitted into evidence at trial, *Duga* established the following rule (which was reaffirmed by the Court in *Jones*):

[I]t is necessary to determine whether (1) a questioner subject to the Code was acting in an official capacity in his inquiry or only had a personal motivation and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation. *United States v. Gibson,* [3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954)]. Unless both prerequisites are met, Article 31(b) does not apply.

*United States v. Duga,* 10 M.J. at 210 (footnote omitted) (citation added). The military judge found Sergeant Beatty was acting in an official capacity as far as his escort duties were concerned, but that he was not acting in an "official investigatory capacity" at the time; his casual conversation with the appellant being motivated by personal curiosity. We deem this issue to be very close. However, the findings of a trial judge will not ordinarily be disturbed on review unless they are unsupported by the evidence or clearly erroneous. *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A.1981); *United States v. Jenkins,* 24 M.J. 846, 848 (A.F.C.M.R.1987); *United States v. Spann,* 24 M.J. 508, 510 (A.F.C.M.R. 1987). Under the particular circumstances present in this case we find that the military judge could conclude that Sergeant Beatty's conversation with the appellant was personally motivated and initiated only out of curiosity. We will be vigilant in insuring that only factual patterns meeting the strict requirements of *Duga* will pass judicial scrutiny.

Even had we determined that the substance of Sergeant Beatty's conversation with the appellant had been erroneously admitted, we would not have found substantial prejudice. Article 59(a), UCMJ, 10 U.S.C. § 859(a). *See generally United States v. Hallock,* 27 M.J. 146 (C.M.A. 1988); *United States v. Brooks,* 26 M.J. 28 (C.M.A.1988). There was abundant independent evidence to support the guilty finding as to the missing movement charge, the only contested offense as the record now stands (the appellant having been found guilty of the unauthorized absence terminated by apprehension in accordance with his pleas). Moreover, the substance of Sergeant Beatty's testimony was in reality

more beneficial than detrimental to the appellant, especially as pertaining to evidence in extenuation and mitigation as bearing on the sentence.

Having considered the errors asserted and the entire record, we conclude that the findings and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and sentence are

AFFIRMED.

Senior Judges LEWIS and KASTL concur.