**UNITED STATES**

v.

**Technical Sergeant Martin S. AARON,
United States Air Force.**

**ACM 33648.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 27 Feb. 1999.

Decided 8 Sept. 2000.

Appellate Counsel for Appellant: Glenn E. Bradford (argued), Colonel Jeanne M. Rueth, and Captain Natasha V. Wrobel.

Appellate Counsel for the United States: Captain Suzanne Sumner (argued), Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers, and Major Steven R. Parrish.

Before YOUNG, Chief Judge, SPISAK, Senior Judge, and ROBERTS, Appellate Military Judge.

## OPINION OF THE COURT

SPISAK, Senior Judge:

The appellant pled guilty to carnal knowledge, sodomy, indecent acts, and adultery with his adopted daughter, JA. Articles 120, 125, 134, UCMJ, 10 U.S.C. §§ 920, 925, 934. Court members also found him guilty of three additional specifications of indecent acts with JA. Article 134, UCMJ, 10 U.S.C. § 934. His approved sentence consists of a bad-conduct discharge, confinement for 6 years and 6 months, forfeiture of all pay and allowances, and reduction to E–1.

The appellant raises four errors for our consideration. First, he contends the military judge erred by denying a motion to suppress evidence derived from videotaped surveillance of the appellant and his adopted daughter. Second, he complains the military judge erred by denying his motion to dismiss Specification 2, Charge III for failure to state an offense. Third, he argues the military judge erred when he denied a motion to dismiss Specifications 2, 3, and 4 of Charge III (all allege indecent acts with JA) as multiplicious and an unreasonable multiplication of charges. Finally, he argues the military judge abused his discretion when he refused to instruct the members to consider the appellant's good military character when determining an appropriate sentence. We find no error and affirm.

## I. FACTS

The appellant married SH in 1990. At the time of the marriage, SH had two young daughters, JA and SA. JA was then 9 years old. In March 1995, the appellant adopted both JA and SA. When JA was 13, she and the appellant began wrestling. Over approximately the next two years, the wrestling led to the appellant touching JA's breasts and, eventually, when JA was 15, to sexual intercourse.

In November 1996, one of SH's friends told agents of the Air Force Office of Special Investigations (AFOSI) that SH suspected inappropriate relations between JA and the appellant. The appellant learned of the possible AFOSI interest in the case from his commander. He called the local area defense counsel, Captain (Capt) Dulaney, who advised him not to talk to the AFOSI. Because SH denied any suspicions and JA denied any sexual involvement with the appellant, the AFOSI closed the investigation without interviewing him.

By Christmas 1996, marital problems between SH and the appellant resulted in the appellant and JA moving out of the marital home to an apartment in which they continued their intimate relationship. In March or April 1998, shortly after her 17th birthday, JA moved out of the apartment. Sexual activity between JA and the appellant ceased until August 1998 when SH ordered JA out of her house. JA returned to the apartment and spent the night with the appellant.

In September 1998, JA told SH that she and the appellant had been sexual partners. The AFOSI again became involved and, together with JA, decided to have JA call the appellant to talk about their relationship. During this call, the appellant repeatedly responded, "I don't know what you're talking about." Therefore, the agents and JA decided that a face-to-face meeting was needed. The AFOSI rented rooms at a local hotel and set up hidden microphones and cameras. JA then called and asked the appellant to come see her. The appellant came to the hotel room on two consecutive nights, 6 and 7 October 1998. On 6 October 1998, he was again guarded in his responses, but did make some incriminating remarks. On 7 October 1998, he became more talkative and made additional incriminating statements, all of which were recorded.

## II. SUPPRESSION OF EVIDENCE

■ A military judge's rulings on the admission or exclusion of evidence, including rulings on motions to suppress, are reviewed for an abuse of discretion. *United States v. Ayala*, 43 M.J. 296, 298 (1995). We review a military judge's findings of fact under a clearly erroneous standard and his conclusions of law *de novo*. *Id.* We use these same standards when an appellant alleges his confession was involuntary because he was denied his right to counsel. *United States v. McLaren*, 38 M.J. 112, 115 (C.M.A.1993). We also review *de novo* the question of whether or not an interrogation occurred. *United States v. Young*, 49 M.J. 265, 267 (1998) (citing *United States v. Kosek*, 41 M.J. 60, 63 (C.M.A.1994)).

The appellant made three arguments in support of his contention that the military judge should have suppressed all evidence derived from the two videotaped conversations he had with JA. First, he contended the AFOSI agents or JA should have advised him of his rights under Article 31(b), UCMJ. Second, he asserted that he was denied his rights against self-incrimination and to due process under the Fifth Amendment, United States Constitution. Third, he argued he was denied his right to counsel under the Sixth Amendment, United States Constitution, and Mil.R.Evid. 304.

### A. Article 31 Rights

In his brief, the appellant relied heavily on *United States v. Duga*, 10 M.J. 206 (C.M.A. 1981), to support his contention that his rights under Article 31, UCMJ, were violated. However, during oral argument, his appellate defense counsel conceded that the portion of the brief that relied on *Duga* is "not well taken." We agree.

■ The court in *Duga* established a two-part test to determine when a suspect is entitled to advisement of rights under Article 31, UCMJ. First, the questioner must be subject to the UCMJ and be acting in an official capacity. Second, the person questioned must perceive the inquiry as more than a casual conversation. Even from a cursory review of the videotape meetings on 6 and 7 October 1998 and the transcripts of those meetings make it clear that the appel-

lant perceived that he was talking with his young daughter and former lover, not an agent of the government.

### B. The Fifth Amendment, Self–Incrimination

■ The appellant's claim that his Fifth Amendment rights were violated is also flawed. As the appellant notes in his assignment of errors, the Fifth Amendment protects an accused "when he is subject[ed] to custodial interrogation." The appellant concedes, he was not subjected to an interrogation as contemplated by *Duga*. However, even if such an interrogation took place, the appellant was not in custody. Rather, he voluntarily appeared at a hotel room that he believed was occupied by his 17–year–old daughter. No one else was present and the appellant left without objection or interference when he chose to do so. Under these circumstances we find there was no custodial interrogation as contemplated by the Fifth Amendment. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (made applicable to the military by *United States v. Tempia*, 37 C.M.R. 249 (C.M.A.1967)).

### C. Sixth Amendment, Right to Counsel

■ The Sixth Amendment provides that in all criminal prosecutions an accused shall enjoy the right to the assistance of counsel. Once the Sixth Amendment right to counsel has attached, law enforcement officials may not interrogate a defendant unless counsel is present or the defendant expressly waives his right to the assistance of counsel. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). "The Sixth Amendment does not preclude all people from communicating with criminal defendants who have invoked their right to counsel after the adversarial process has begun. Rather, it is 'the prosecutorial forces of organized society' and their minions who are barred from initiating contact at that point." *United States v. Moreno*, 36 M.J. 107, 118 (C.M.A.1992) (citations omitted).

■ The Supreme Court defines interrogation as "express questioning or its functional equivalent." *Rhode Island v. Innis*,

446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In applying this definition, we evaluate the actions of criminal investigators using an objective standard. *Id.* at 301–02, 100 S.Ct. 1682; *United States v. Meeks,* 41 M.J. 150, 161 (C.M.A.1994). The term "functional equivalent" refers "to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Young,* 49 M.J. 265, 267 (1998) (quoting *Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682). Similarly, in Sixth Amendment cases, the Supreme Court has defined interrogation as conduct by law enforcement officials designed to deliberately elicit incriminating information. *Brewer,* 430 U.S. at 399, 97 S.Ct. 1232.

■ Clearly, the AFOSI and JA hoped the videotaped meetings would result in the appellant making incriminating statements. We will, for the moment, assume that these meetings were interrogations for purposes of the Sixth Amendment. *See Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Now, we must determine whether or not the Sixth Amendment right to counsel attached before those meetings took place.

The United States Supreme Court has visited this very question on numerous occasions over the years. In *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Court reviewed its prior decisions and noted that cases in which they had previously found the "existence of the right to counsel . . . involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. 1877. No such "adversary criminal proceeding" occurred in this case prior to 7 October 1998. Thus, the Sixth Amendment right to counsel had not attached and no violation of the appellant's rights under that Amendment occurred.

D. *United States v. McOmber:* Notice to Counsel

The appellant contends "a statement may be rendered involuntary when retained or appointed counsel is not allowed to be present at an interrogation, even before Sixth Amendment right to counsel attaches." In support of this contention, the appellant relies on *United States v. McOmber,* 1 M.J. 380 (C.M.A.1976).

In *McOmber,* the Court of Military Appeals (now the United States Court of Appeals for the Armed Forces) held "that once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code." *Id.* at 383. This decision "was predicated on an accused's statutory right to counsel as set forth in Article 27[, UCMJ, 10 U.S.C. § 827,] and not the Sixth Amendment right." *United States v. McDonald,* 9 M.J. 81, 83 (C.M.A. 1980).

Subsequent to the decision in *McOmber,* Mil.R.Evid. 305(e) was modified to conform with the holding in *McOmber.* Under this revised rule, a service member's right to counsel was extended "beyond that provided under the . . . Sixth Amendment of the Constitution." *United States v. Shepard,* 38 M.J. 408, 414 (C.M.A.1993). Quoting the rule, the Court further explained that it was "applicable only at the point that the intended questioner 'knows or reasonably should know' that counsel has been appointed or retained." *Id.*

■ Then, eighteen years after deciding *McOmber,* the Court suggested that the basis for its holding in *McOmber* was not supportable. Citing *United States v. Clark,* 48 C.M.R. 77, 1973 WL 14907 (C.M.A.1973), for the proposition that there was no right to counsel at interrogations other than those specified in *Miranda,* the Court noted that "*McOmber* cannot reasonably be based on Article 27 . . . which concerns assignment of counsel for special and general courts-martial," because Article 27 has not changed since *Clark* was decided. *United States v. LeMasters,* 39 M.J. 490, 492 n. * (C.M.A. 1994). Thus, while the court in *McOmber* stated the decision was statutorily based on Article 27, it is no longer clear that this article mandates the *McOmber* notice to

counsel rule. However, because the decision in *LeMaster* was based not on *McOmber*, but on the then existing version of Mil.R.Evid. 305(e), the court did not specifically overrule *McOmber*. Thus, while it is unclear whether or not the case continues to properly state the law, we will presume that it does. Based on *McOmber* then, if the appellant's argument is to succeed, we must find that the appellant had established an attorney-client relationship with Capt Dulaney **and** that the AFOSI agents knew or reasonably should have known of that representation.

1. Existence of Attorney–Client Relationship

The appellant contends that because he spoke with Capt Dulaney by telephone and was advised not to speak to AFOSI, an attorney-client relationship was established. He also argues that he took no action to sever that relationship; therefore, two years later, after his "counsel" had transferred to another state, and after additional charges and more specific charges were being investigated, he still had a viable attorney-client relationship with Capt Dulaney.

 "Communications between a servicemember and a military attorney, even if sufficient to qualify as confidential under the attorney-client privilege, do not necessarily establish the existence of an attorney-client relationship because the privilege protects a communication, even when there is no ongoing attorney-client relationship." *United States v. Spriggs*, 52 M.J. 235, 240 (2000) (citing Mil.R.Evid. 502(b)(1)(2)). Such communications between an attorney and a potential client create an attorney-client relationship only if there is a "bilateral understanding between an attorney and a client as to the ongoing nature of the services to be provided." *Id.* Moreover, even prior representation of the client on charges that encompass the same subject matter "does not necessarily demonstrate the existence of an ongoing attorney-client relationship." *Id.* To avoid severance of an attorney-client relationship, the attorney must demonstrate that his activities reflect active engagement in the preparation and pretrial strategy of a case. *Id.*

Here the military judge found that no attorney-client relationship was ever established between the appellant and Capt Dulaney. We agree. The appellant testified that when his commander informed him in 1996 that the AFOSI was investigating allegations of an inappropriate relationship between him and JA, he called Capt Dulaney and asked what to do. Capt Dulaney told him not to talk to the AFOSI. Thereafter, the appellant never spoke to Capt Dulaney again.

Capt Dulaney testified he remembered the circumstances of the case and the names of two witnesses and thought he had spoken with the appellant. However, he did not remember any specific advice or actions he may have taken. Capt Dulaney did recall "making some calls," and something about a Freedom of Information Act request, but could not recall to whom those calls were made or when. He then explained his normal course of action in cases involving allegations of serious misconduct, which would include talking to the squadron first sergeant, legal office, and, the AFOSI case agent. However, he had neither any record nor any specific memory of having done so in this case.

Both the appellant and Capt Dulaney testified that after the captain departed Whiteman AFB in the summer of 1997, Capt Dulaney had no further contact with the appellant and no involvement in his case until 18 months later when one of the appellant's appointed defense counsel called him two or three weeks before trial. Under these circumstances we find that there was neither a "bilateral understanding" between the appellant and Capt Dulaney that created an ongoing attorney-client relationship, nor did Capt Dulaney take any active part in investigating or preparing the appellant's case for trial. In short, the military judge did not abuse his discretion by finding that no attorney-client relationship existed between Capt Dulaney and the appellant because the evidence leads to no other conclusion. *Ayala*, 43 M.J. at 298.

2. AFOSI Knowledge of an Attorney–Client Relationship

 Even if an attorney-client relationship existed, the AFOSI had no knowledge of

that relationship prior to 7 October 1998. At oral argument and in his brief to us, the appellant argued that either Special Agent Heykoop, AFOSI, or JA, knew that he had established an attorney-client relationship with Capt Dulaney. Therefore, he argued that Capt Dulaney should have been notified, pursuant to the court's direction in *McOmber*, before he was "interrogated" on 6 and 7 October. However, the military judge found, that the appellant neither mentioned Capt Dulaney's name to Agent Heykoop nor told him that he had a relationship with the area defense counsel.

We will not overturn a military judge's finding of facts unless they are clearly erroneous. *Ayala*, 43 M.J. at 298. Although the appellant's testimony and that of Agent Heykoop contradict one another, the military judge had the opportunity to observe the demeanor of both witnesses and to consider their testimony as it related to other evidence before him. This somewhat conflicting testimony, along with Capt Dulaney's nearly complete lack of memory of his "client" or his specific actions on that "client's" behalf, convinces us that the military judge did not abuse his discretion and that Agent Heykoop was never told by the appellant or Capt Dulaney that the captain represented the appellant.

In the absence of any evidence that JA told the AFOSI that her father had contacted an attorney in 1996, we also find that any notice to JA was ineffective to give the agents notice of an attorney-client relationship. The appellant testified that he told JA that he talked with Capt Dulaney when she was merely 15 years old and while she was not only not working with the AFOSI, but was lying to them in an effort to protect her adoptive father. Nearly two years passed before JA began to cooperate with the AFOSI investigators.

 There is nothing in the record, and the appellant has made no argument, that at age 15 JA knew or should have known the significance of the supposed contact between the appellant and Capt Dulaney. Nor is there any evidence to indicate that, on 6 October 1998, JA even remembered that such contact occurred. Therefore, even if JA

was subject to the UCMJ during the surveillance, which we do not decide, we decline to impute to the investigators any knowledge that she may have had in 1996 concerning the appellant's efforts to obtain legal counsel. Any other result would make it far too easy for suspects to thwart criminal investigations merely by providing their minor victims with information, the significance of which the victim would be unlikely to understand. Therefore, we hold that knowledge by a minor victim of a relationship between her assailant and an attorney does not support a finding that criminal investigators with whom the victim later cooperates "knew or should have known" of that attorney-client relationship.

### E. Mil.R.Evid. 305(e)

Whether *McOmber* remains viable or not, we must still consider the requirements and limitations of Mil.R.Evid. 305(e) to determine whether or not the appellant's right to counsel was violated. In 1994 this rule was amended to conform military practice with the United States Supreme Court's rulings in *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) and *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). The revision eliminated the notice to counsel provisions and divided subdivision (e) into two subparagraphs. Subparagraph (e)(1) applies the suspect's Fifth Amendment right to counsel and conforms military practice to *Minnick*. Subparagraph (e)(2) applies the Sixth Amendment right to counsel and conforms to *McNeil*. Drafter's Analysis, *Manual for Courts–Martial, United States*, A22–15 (1995 ed.).

Subparagraph (e)(2) applies to interrogations that occur after referral of charges. Charges here were not referred until 17 December 1998, more than two months after the surveillance about which the appellant complains. Therefore, our decision will be controlled by Mil.R.Evid. 305(e)(1), which states:

> *Custodial interrogation.* Absent a valid waiver of counsel under subdivision (g)(2)(B), when an accused or person suspected of an offense is subjected to custodial interrogation under circumstances described under subdivision (d)(1)(A) of this

rule, and the accused or suspect requests counsel, counsel must be present before any subsequent custodial interrogation may proceed.

▮ Subdivision (d)(1)(A) provides that "[w]hen evidence of a testimonial or communicative nature ... is sought or is a reasonable consequence of an interrogation," a suspect is entitled to consult with counsel, have counsel present during the interrogation, and be warned of these rights if (1) the interrogation is conducted by someone subject to the UCMJ who is required to advise the suspect of his rights under Article 31, UCMJ; and, (2) "the suspect is in custody, could reasonably believe himself or herself to be in custody, or is otherwise deprived of his or her freedom of action in any significant way...." Thus, in order for us to find that the appellant's right to counsel was infringed by his 6 and 7 October meetings with his adopted daughter, we must determine (1) that he was subjected to interrogation; (2) that his daughter, JA, was required to advise him of his rights under Article 31, UCMJ; and, (3) that he was in custody or otherwise deprived of his freedom of action in a significant way.

We have reviewed both the videotapes and the transcripts of his conversations with JA during these two meetings. We find that, although the accused was somewhat suspicious of JA's intentions and possible involvement with investigators, he was free to leave the hotel room at any time. More importantly, his demeanor and conversations makes it obvious that he was aware that he was free to leave. His assertions before us and at trial that he was somehow under JA's spell or compelled by her to remain are unsupported by the evidence.

We find that the appellant was neither in custody nor subjected to any deprivation of his freedom. The absence of custody dictates that the appellant's right to counsel under Mil.R.Evid. 305(e) was not violated and that the military judge did not abuse his discretion by denying the appellant's motion to suppress all evidence derived from his videotaped conversations with JA.

## III. FAILURE TO STATE AN OFFENSE

▮ The appellant contends that Specification 2, Charge III, fails to state an offense. He raised this claim prior to entering pleas, but after his motion to dismiss was denied, the appellant admitted the indecent nature of his actions and pled guilty. A plea of guilty waives any objection that relates to factual issues of guilt. Rule for Courts-Martial (R.C.M.) 910(j). However, failure of a charge to state an offense is not waived. R.C.M. 905(e).

▮ The focus of a motion to dismiss for failure to state an offense is the specification itself. *United States v. Galchick*, 52 M.J. 815, 816 (A.F.Ct.Crim.App.2000); *United States v. Commander*, 39 M.J. 972, 980 (A.F.C.M.R.1994). In order to avoid dismissal for failure to state an offense, the specification must contain the elements of the offense intended to be charged in sufficient detail to give the accused notice of the allegations against him and allow him to prepare to defend against those allegations. *United States v. Sell*, 11 C.M.R. 202, 206 (C.M.A. 1953).

▮ The offense of committing indecent acts requires that the accused committed a certain wrongful act, that the act was indecent, and that under the circumstances, the accused's conduct was to the prejudice of good order and discipline or of a nature to bring discredit upon the armed forces. Specification 2, Charge III, was charged as follows:

> In that TECHNICAL SERGEANT MARTIN S. AARON ... did, at or near the State of Missouri, on divers occasions from on or about 10 March 1997 to on or about 31 May 1998, wrongfully commit indecent acts with his adopted daughter, [JA], by having sexual intercourse with her.

The specification contains all of the essential elements of the offense of committing indecent acts and is sufficient. Therefore, the military judge did not abuse his discretion in denying the motion to dismiss. However, the appellant's complaint, both at trial and before us, would more properly be catego-

rized as a challenge to the legal sufficiency of the evidence.

## IV. LEGAL SUFFICIENCY

■ Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires that we approve only those findings of guilty that we determine to be correct in both law and fact. The test for legal sufficiency is whether, when the evidence is viewed in the light most favorable to the government, a reasonable factfinder could have found the appellant guilty of all elements of the offense, beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *United States v. Ladell*, 30 M.J. 672, 673 (A.F.C.M.R.1990).

■ In response to the military judge's request that he explain why he thought he was guilty of this offense, the appellant stated: "I did have sexual intercourse with [JA], who was, at the time, my adopted daughter, so, that would, of course, as you put it earlier, make the act indecent." The military judge had defined "indecent act" as "that form of immorality relating to sexual impurity, which is not only grossly vulgar, obscene, and repugnant to common propriety, but tends to excite lust and deprave morals with respect to sexual relations." We agree with the appellant's conclusion that having sexual relations with his adopted daughter was indecent. Our superior court has also found such conduct fits the definition of indecent: "the indecency was two parties engaging in sexual intercourse when there was a familial relationship between them." *United States v. Wheeler*, 40 M.J. 242, 247 (C.M.A.1994).

We are satisfied that the evidence is legally sufficient to support the appellant's conviction of committing indecent acts with JA, his adopted daughter, by having sexual intercourse with her. We also find that the appellant's plea of guilty to that offense was provident.

## V. CHARGE III AND ITS SPECIFICATIONS

■ The appellant contends that Specifications 2, 3, and 4 of Charge III are either multiplicious or that they constitute an unreasonable multiplication of the charges against him. He, therefore, asks that we dismiss all three specifications. However, his plea of guilty to Specification 2 waived any such objection unless the offenses are "facially duplicative," that is, factually the same. *United States v. Broce*, 488 U.S. 563, 570, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). *See United States v. Lloyd*, 46 M.J. 19 (1997). Moreover, even if we found these three specifications multiplicious with one another or to constitute an unreasonable multiplication of charges, we would not dismiss all three. Rather, we would merge specifications 3 and 4 with specification 2, to which the appellant pled guilty. However, we do not find these specifications violative of either concept.

### A. Multiplicity

■ Military multiplicity doctrine is based on the Double Jeopardy Clause of the Fifth Amendment and protects an accused against being convicted and punished twice for the same offense. "[A] constitutional violation under the Double Jeopardy Clause of the Constitution now occurs only if a court, *contrary to the intent of Congress*, imposes multiple convictions and punishments under different statutes for the same act or course of conduct." *United States v. Teters*, 37 M.J. 370, 373 (C.M.A.1993). When Congress is silent, we use the Supreme Court's rule of construction announced in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine congressional intent. *Teters*, 37 M.J. at 377. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180).

■ Although the three specifications allege that the offenses took place within the same time period and with the same victim, they are clearly separate: Charge III, Specification 2 involved sexual intercourse; Specification 3 involved penetration of the victim's vagina with a beer bottle; and Specification 4 concerned rubbing his penis between her breasts until he ejaculated. Each specifica-

tion alleges a discrete act. Therefore, they are not multiplicious.

### B. Unreasonable Multiplication of Charges

■ The appellant contends that Specifications 2, 3, and 4 represent an unreasonable multiplication of charges because they constitute "substantially one transaction." R.C.M. 307(c)(4), Discussion. He then asks that we set aside the findings with regard to all three specifications and order a rehearing.

■ The test for unreasonable multiplication of charges is whether military prosecutors needlessly piled on charges against an accused for what is substantially one transaction. R.C.M. 307(c)(4), Discussion. Thus, even if the multiplicity doctrine permits the conviction and punishment of an accused for more than one offense for what is a single act, a military judge may exercise his equitable powers to adjust the maximum sentence. *United States v. Erby*, 46 M.J. 649 (A.F.Ct.Crim.App.1997), *aff'd in part and modified in part*, 49 M.J. 134 (1998). When they exercise this power, military judges act as the "gatekeeper," ensuring a fair result. As our superior court mentioned in *United States v. Foster*, 40 M.J. 140, 144 (C.M.A. 1994), and we reemphasized in the *Erby* case, "there are equitable considerations within the discretion of the trial judge when it comes to sentencing, although we have not tied those considerations in so many words to the ... admonitions in the Rules for Courts–Martial [307(c)(4) and 1003(c)(1)(C) ]." *Erby*, 46 M.J. at 652.

As noted earlier in our discussion of multiplicity doctrine, the three specifications each allege a separate act. As such, the unreasonable multiplication of charges doctrine simply does not apply.

### VI. FAILURE TO INSTRUCT MEMBERS

■ The appellant requested that the military judge include his good military character as one of the factors the members should consider in reaching an appropriate sentence. After hearing the sentencing evidence, the military judge declined to give a specific instruction on "good military character." We review a military judge's refusal to

give a sentencing instruction for an abuse of discretion. *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993). We will reverse only if we find the military judge's decision to have been arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987).

■ Required instructions are set out in R.C.M. 1005(e) and include (1) the maximum authorized punishment; (2) the effect a punitive discharge and confinement, or confinement in excess of 6 months will have on the accused's pay and allowances; (3) the procedures for deliberating and voting on the sentence; (4) that the members are solely responsible for selecting an appropriate sentence and may not rely on the possibility of any mitigating action by the convening or higher authority; and, (5) that the members should consider all matters in extenuation, mitigation, and aggravation, whether introduced before or after findings, as well as all matters introduced under R.C.M. 1001(b)(1), (2), (3), and (5) (which include service data and character of prior service). The military judge has substantial discretionary authority to determine what other instructions to give. *United States v. Pagel*, 40 M.J. 771, 780 (A.F.C.M.R.1994). *Cf. Damatta–Olivera*, 37 M.J. at 478. However, even if the military judge's instructions are inadequate, we will not grant relief unless there is a showing of prejudice. *United States v. Mabry*, 38 C.M.R. 83 (C.M.A.1967).

After denying the requested instruction, the military judge instructed the members that they should consider the appellant's NCO status and

> the accused's past record and reputation in the service for good conduct and efficiency; the accused's prior honorable discharges; overseas service of the accused; the family and domestic difficulties of the accused; the accused's financial difficulties; the accused's APRs and EPRs; lack of previous convictions, Article 15s, or other disciplinary actions; the accused's indication that he wishes to remain in the service; the accused's indication that he does not desire a punitive discharge.

■ Furthermore, the instructions were much more specific than is required. While

these instructions did not use the exact words that the trial defense counsel requested, they did provide the members with the guidance the trial defense counsel sought—consider his record for good military character and service. We are unable to find any prejudice to the appellant from the military judge refusing to use the words "good military character" when he specifically directed the members to consider the appellant's accomplishments, lack of disciplinary problems, prior honorable service, and promotion to NCO status. We find no abuse of discretion.

## VII. CONCLUSION

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Chief Judge YOUNG and Judge ROBERTS concur.