UNITED STATES, Appellee,

v.

Captain Ina J. GUYTON–BHATT, United States Army, Appellant.

ARMY 9800418.

U.S. Army Court of Criminal Appeals.

23 Feb. 2001.

For Appellant: Charles W. Gittins; Captain David S. Hurt, JA (on brief).

For Appellee: Lieutenant Colonel Edith M. Rob, JA; Major Anthony P. Nicastro, JA; Captain Kelly D. Haywood, JA (on brief).

Before MARCHAND, Chief Judge, CARTER, and HARVEY, Appellate Military Judges.

OPINION OF THE COURT

CARTER, Judge:

A general court-martial composed of officer members convicted appellant, contrary to her pleas, of dishonorable failure to pay a just debt, lying, and presenting an altered promissory note, in violation of Article 133, Uniform Code of Military Justice, 10 U.S.C. § 933 [hereinafter UCMJ]. The adjudged sentence consisted of a dismissal, forfeiture of all pay and allowances, and a reprimand. The convening authority approved a sentence to a dismissal, forfeiture of $2,472.00 pay per month for eighteen months, and a reprimand.

This case is before the court for review under Article 66, UCMJ, 10 U.S.C. § 866.

This case demonstrates why the law does not favor oral contracts. It involves appellant's failure to fully satisfy an oral agreement to purchase a used automobile from a sergeant first class (SFC R). The recollection and interpretation of the parties are different concerning the terms of the oral agreement, the modifications thereto, including an "altered" promissory note, the mechanical condition of the automobile at the time of sale, and the nature of their personal relationship. The charges arose after a judge advocate performing legal assistance duties contacted appellant and unsuccessfully sought payment on behalf of SFC R. This case also raises ethical considerations concerning the threat of a court-martial to attempt to secure an advantage in the negotiated settlement of an unpaid debt.

Three of appellant's assignments of error challenge the military judge's failure to suppress appellant's statements to a judge advocate performing legal assistance duties, her failure to give a mistake of fact instruction, and her rulings on multiplicity. Appellant also asserts that there was no debt due for her purchase of an automobile because there was no transfer of ownership under state law.[1] We will grant relief on the failure to give a mistake of fact instruction and the multiplicity issue, as well as factual sufficiency issues not raised by appellant.

### Findings of Fact

We found the testimony of neither party to this contract dispute to be completely credible in all details of their transactions. Exercising our Article 66(c), UCMJ, authority, we make the following findings of fact:

1. Appellant (the buyer of the automobile) has served over twenty years on active duty, including approximately sixteen years of enlisted service. Appellant is a psychologist with two masters degrees and is working on her Ph.D.

2. Sergeant First Class (promotable) R (the seller of the automobile) is a supply sergeant with over fifteen years on active duty, primarily serving in special forces.

3. The automobile in question is a 1986 Jaguar XJ6 Vanden. Sergeant First Class R purchased the automobile during or before 1993 for $6,000.00 and paid $2,200.00 for service and improvements to the vehicle between 1993 and 1995. On 15 July 1996, SFC R applied for and received a new vehicle title from the State of Washington for the Jaguar. In his sworn application, SFC R stated the automobile had 94,962 miles (Prosecution Exhibit (PE) 30). Sergeant First Class R signed as both the registered owner and the legal owner on the new title, wrote in a sales price of $2,000.00, and left the sales date blank.

4. Appellant was reassigned from Korea to Fort Lewis, Washington, in mid-August 1996. Appellant's husband remained in Korea until April 1997. In late August 1996, appellant orally agreed to pay SFC R $8,000.00 for his 1986 Jaguar, provided they could work out a payment plan. Appellant explained that she had already received advance pay during her move from Korea and that she was also purchasing a house. Sergeant First Class R stated that he "was willing to work with her" on a payment schedule. The parties orally agreed that appellant would pay SFC R $500.00 a month for eight months and then pay the remaining $4,000.00 in one final lump sum payment. No specific agreement was made concerning when the first payment was due, on which day of the month subsequent payments were due, how or where payments were to be made, or whether there was any warranty for the Jaguar. The next day, SFC R gave appellant the car keys, registration, and title. Neither party notified Washington state motor vehicle authorities of the sale, nor took any action to transfer the registration or the title to appellant. A few days later, appellant went to SFC R's office and made the first $500.00 payment in cash. Appellant made no other payments to SFC R for the automobile.

---

1. We have considered appellant's remaining assignments of error and find them to be without merit.

5. The following table describes appellant's military pay, Jaguar repairs and some of the extraordinary expenses affecting her ability to pay SFC R.

| MONTH AND YEAR | MID-MONTH PAY | END OF MONTH PAY | ADDITIONAL FUNDS | | EXTRAORDINARY EXPENSES & CAR REPAIRS |
|---|---|---|---|---|---|
| Jul 96 | $1971.00 | 0 | $6,158.00 | Advance Pay | |
| Aug 96 | 0[2] | 0[3] | $2,105.00 | Casual Pay | |
| Sep 96 | $3,884.47 [4] | $1,384.69 | $2,566.00 | Advance Pay | |
| Oct 96 | $1,198.30 | $1,178.42 | $771.98 | AER loan | $14,345.00 |
| | | | $8,000.00 | loan [5] | Federal Taxes [6] |
| Nov 96 | $1,130.62 | $784.23 [7] | | | $598.06 tax levy |
| | | | | | $98.11 repair [8] |
| Dec 96 | $1,197.82 | $1,197.79 | | | |
| Jan 97 | $588.00 [9] | $587.98 | $2,000.00 | loan [10] | $1,344.00 debt |
| | | | | | $462.78 repair [11] |
| Feb–Jun 97 | $1260.00 | $1259.98 | | | |
| Jul 97 | $1260.00 | $1260.98 | $3,793.55 | AER loan [12] | |
| Aug 97 | $1735.04 | $1735.02 | | | |

6. On 18 September 1996, appellant paid Midas Muffler $19.95 for an estimate of repair for the automobile's brakes and exhaust system. Recommended repairs to the exhaust system, catalytic converter, brakes, and to repack the right rear wheel bearing totaled $1,418.49. The repair estimate listed 110,025 miles on the vehicle (DE C).

7. In mid-October 1996, SFC R first contacted appellant about missing a payment. Appellant explained that she was still having financial problems and that she had applied for an AER loan. On 25 October 1996, appellant paid several thousand dollars at settlement for her new home.

8. In late October 1996, SFC R became concerned about his oral contract and asked appellant to execute a promissory note. Appellant agreed. On 1 November 1996, appellant executed a promissory note at the Fort Lewis legal assistance office, wherein she promised to pay the balance of $7,500.00 at the rate of $500.00 per month until paid in full, with the first payment due "1/15/97." A notary public witnessed appellant's signature to the promissory note. Appellant did not deliver this promissory note to SFC R until mid-January 1997 (see para. 10, findings of fact).

9. Sergeant First Class R called appellant in November 1996 after receiving no November payment. Appellant said they

2. To repay her advance pay, appellant's pay was reduced by $513.16 in August and September 1996, by $726.99 from October 1996 through July 1997, and by $213.91 in August 1997.

3. Appellant was entitled to receive $2,320.95 in August 1996 (including $1,150.95 from July).

4. Mid-month pay included the previously unpaid amounts from July and August 1996.

5. On 25 October 1996, appellant received a $771.98 Army Emergency Relief (AER) loan to pay her temporary billeting bill, to be repaid in twelve monthly allotments of $64.31, beginning December 1996 (PE 30). In October 1996, appellant borrowed $8,000.00 from a friend in Korea. This loan was due the first week of February 1997, but was not repaid until January 1998.

6. On 21 October 1996, appellant paid $14,345.00 to the Internal Revenue Service for back taxes, penalties, and interest for tax years 1990, 1991, 1992, and 1995 (PE 30, Defense Exhibit (DE) H).

7. Appellant's pay was reduced by a $598.06 tax levy by the Internal Revenue Service.

8. On 23 December 1996, appellant paid $98.11 for an adjustment to the vehicle's windshield wiper motor (DE J–1).

9. Appellant had a total of $1,344.00 deducted from her mid-month and end of month January 1997 pay for an Army and Air Force Exchange Service debt.

10. About January 1997, appellant borrowed $2,000.00 from Command Sergeant Major Dickson (a friend of both appellant and SFC R), which she repaid, apparently on time, in August 1997.

11. On 6 January 1997, appellant paid $462.78 to replace the Jaguar's starter (DE J–1).

12. On 13 May 1997 appellant received a second AER loan in the amount of $3,793.55 for automobile repair and mortgage assistance, to be repaid in twelve monthly allotments of $316.13, beginning October 1997.

were still screwing up her pay and that she would pay him whenever they got her pay straight. In December 1996, SFC R again contacted appellant after he received no payment. Appellant stated that she was still having pay problems, but told SFC R that she had executed the promissory note, with payments to begin in January 1997. Sergeant First Class R told her he was "offended" that she would change the due date to January 1997 without consulting him, but did not clearly state whether or not he agreed to the revised payment schedule. He did not ask for the promissory note.

10. About mid-January 1997, SFC R again called appellant after receiving no payment. Appellant stated that "now it seemed like she was getting a no pay due." Sergeant First Class R asked for and received the original copy of the promissory note executed on 1 November 1996 (PE 4). Appellant admitted during her testimony that she changed this promissory note in two ways before delivering it to SFC R, but stated that she did not know it was wrong to do so. First, appellant changed the due date of the first payment from "1/15/97" to "4/15/97." Second, she added the following sentence: "Due to unexpected expenses incurred on 1/5/97, to the tune of $550.00, to replace starter and battery the monthly payments will have to be delayed until 6/16/97." [13]

11. After reviewing the promissory note, SFC R called appellant and told her that he had not agreed to postpone the payments until June 1997. Appellant responded that she told him she was having pay problems, that he said he would work with her, and that she could not pay him until June. Sergeant First Class R told appellant he did not agree to those terms, but was still willing to work with her. He was unsure if he was bound by the June date, but he did not want to get appellant into trouble and decided to give her some time. In February and March 1997, appellant told SFC R that she received no pay due and that she was continuing to have pay problems. In April 1997, appellant told SFC R that she was still not receiving any

pay. He asked appellant to give him the keys to the automobile, but she declined saying she would start paying him in June 1997 as stated in the promissory note. He told appellant that he expected a payment in his mailbox when he returned from an upcoming school on 18 June 1997.

12. In April 1997, the automobile became completely inoperable because of a broken right rear hub assembly and axle, probably caused by a failed right rear wheel bearing. After it became inoperable, appellant received a repair estimate of $6,138.59 to replace the rear axle (both sides), the exhaust system, and the wiper motor (DE J–1). Later in April 1997, SFC R saw the automobile abandoned on the side of a road on Fort Lewis and took pictures of it. Neither appellant nor SFC R took any action to move or repair the automobile until August 1997. Appellant used the automobile as her primary means of transportation from August 1996 until it became inoperable in April 1997.

13. Sergeant First Class R did not contact appellant during May 1997. Sometime in late June 1997, SFC R asked appellant about not receiving any payment on or about 18 June 1997. Appellant said she was still having pay problems. On 27 June 1997, appellant gave SFC R, at his request, the vehicle registration and related documents, so that he could renew the vehicle's Washington state registration. The registration and title remained in SFC R's name from July 1996 through appellant's trial.

14. On 1 July 1997, SFC R took the promissory note to First Lieutenant (1LT) C, a new legal assistance attorney, for advice. This is the first time SFC R talked with an attorney about appellant's debt. Sergeant First Class R pointed out the changes in the promissory note. After examining the promissory note, 1LT C believed that appellant had committed a crime by altering the promissory note. First Lieutenant C telephoned appellant to discuss the unpaid debt. First Lieutenant C explained to appellant that he

---

13. Appellant's AER loan file (PE 30) contains a copy of a different altered version of this promissory note. This copy lists a payment due date of "4/15/97" and contains a different added sentence: "Due to unforseen (sic) pay problems payments will start 1 June '97." No charges were preferred concerning this "altered" promissory note.

was a legal assistance attorney representing SFC R concerning her alleged failure to pay for SFC R's automobile. Appellant declined to discuss the matter, stating that she was with a client. First Lieutenant C felt that appellant was being evasive and demanded that she return his call as soon as possible. As a result of the tone of this conversation, 1LT C subsequently researched the Manual for Courts–Martial and the UCMJ to determine what crime appellant committed if she had altered the promissory note.

15. Appellant telephoned 1LT C about fifteen minutes later and counseled him for his disrespectful and demanding tone during their earlier conversation. First Lieutenant C was "irritated" and "ticked" by appellant's remarks. First Lieutenant C began to question appellant about the debt. He did not advise appellant of her rights under Article 31, UCMJ, 10 U.S.C. § 831. During the suppression motion, 1LT C testified that appellant admitted that she bought a car from SFC R and owed him money for it. First Lieutenant C further testified that appellant stated that she was having financial problems, that she had no money, and that she could not pay because you "couldn't get blood from a stone."

16. The government's direct examination of 1LT C on the merits lasted only five pages in the record of trial. First Lieutenant C described his meeting with SFC R and the alterations to the promissory note. Only one paragraph of his direct testimony described admissions by appellant:

> I asked her whether she had—she had bought a car from Sergeant [R]. I asked her whether she—she owed an amount of money to him. She replied yes to both of those questions. She admitted that she owed the debt, and I said, "Would you pay the debt to Sergeant [R]? It's now been over a year." And she said, "No, I'm not going to pay any money." And basically she indicated that you "couldn't get blood from a stone."

17. When 1LT C determined that there was no money forthcoming, he began to question appellant about the "inconsistencies" in the promissory note. At some point in the conversation, 1LT C told appellant that she had committed the offense of forgery under the UCMJ by altering the original terms of the promissory note. Appellant responded that maybe she should get an attorney. The conversation terminated one or two minutes later when "there were sort of red bells" in 1LT C's mind. After talking with appellant, 1LT C advised SFC R that he should pursue criminal charges against appellant, and took him to the criminal law section to meet with the trial counsel for appellant's unit. First Lieutenant C also referred SFC R to a civilian lawyer.

18. On 3 July 1997, appellant's company commander "flagged" her pending court-martial action. Appellant telephoned SFC R that evening and asked what was going on. Sergeant First Class R replied, "Well, I knew (sic) you brought this on yourself. Why would you address a JAG officer's disrespect (sic), because now he's ticked off at you and he's coming after you." After 3 July 1997, negotiations to settle the unpaid debt occurred only through attorneys.

19. During the next few days in July 1997, both SFC R and 1LT C made written statements to support criminal charges against appellant. Additionally, 1LT C talked with the trial counsel and encouraged her to take action under the UCMJ against appellant. First Lieutenant C believed that it was in his client's best interest to pursue criminal charges because it would give SFC R a better chance of getting his money back. First Lieutenant C had no "official" role in the criminal prosecution of appellant, "other than for [SFC R] to bounce things off of."

20. Appellant retained Mr. David Sklar (her civilian defense counsel at trial) sometime in July 1997. Mr. Sklar spoke with 1LT C about the case on 29 July 1999 and wrote letters to the military police investigator[14]

---

14. In a portion of this letter redacted by the military judge prior to admitting it into evidence, Mr. Sklar stated: "I further suggest that the improper use of criminal charges, ... and the pursuit of these actions over even SFC [R]'s protest is a matter of egregious violations best left in the hands of the Staff Judge Advocate."

and 1LT C, dated 30 July 1999, in an attempt to resolve the case (DE J–1).

21. On 18 August 1997, appellant returned the keys to the automobile to SFC R through Captain (CPT) N of the Fort Lewis legal assistance office. In August and September 1997, SFC R had the vehicle serviced by Foreign Autoworks for $5,535.30. Service included replacement of the following parts (some replacement parts were used or rebuilt): rear brakes; rotors; calipers; right rear axle, hub, and wheel bearing assembly; most of the exhaust system; all coolant hoses; water pump; heater valve; lower ball joints; windshield wiper motor; and the fuel pressure regulator. The vehicle also received a complete tune-up, an oil change and oil filter, and automatic transmission service. The repair receipts indicate 110,632 miles on the vehicle (PE 33 and 34).

22. The original Charges and Specifications were preferred on 26 September 1997 and investigated on 8 October 1997 (Article 32, UCMJ, investigation report, dated 15 October 1997). The Additional Charge and its Specification were preferred on 6 November 1997 and investigated on 10 December 1997 (Article 32, UCMJ, investigation report, dated 10 December 1997).

23. In December 1997, SFC R's civilian attorney was in active negotiations with appellant's trial defense team to settle the dispute. In December 1997, SFC R rejected a $7,500.00 settlement offer as full payment for the Jaguar as unreasonable and insufficient,[15] after discussing the offer with his civilian attorney. On 23 January 1998 (six weeks after the second Article 32, UCMJ, investigation was completed), the Charges and Additional Charge and their Specifications were referred to a general court-martial.

24. Appellant was sentenced on 20 March 1998. On 16 July 1998, appellant's military

defense counsel submitted a memorandum to the staff judge advocate stating that appellant did not "desire to submit any matters for clemency and she does not want me to request clemency on her behalf." The convening authority took action on her case on 24 July 1998. Appellant took ordinary leave from 3 August 1998 to 23 September 1998. She was placed on involuntary excess leave effective 24 September 1998.

## Suppression Motion

Appellant asserts that the military judge erred by not suppressing 1LT C's testimony as a violation of appellant's Article 31, UCMJ, rights. Article 31(b), UCMJ, provides that:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

This Article further provides that any statement obtained in violation of Article 31, UCMJ, may not be received into evidence against an accused in a trial by court-martial. UCMJ art. 31(d). Congress enacted this provision in 1950 as part of the Uniform Code of Military Justice to serve as a safeguard against the "subtle pressures" in military society which might otherwise cause a servicemember, who is conditioned to obey, to answer incriminating questions. *See United States v. Armstrong*, 9 M.J. 374, 378 (C.M.A.1980). The rationale for Article 31(b) is to avoid compulsory self-incrimination. "Because of the effect of superior rank or official position upon one subject to military

---

**15.** During the sentencing phase of the trial, a letter written to SFC R's civilian attorney by one of appellant's military trial defense attorneys was admitted. The letter, dated 29 December 1997 (DE P), with a copy to the trial counsel, stated, in part, "CPT Guyton–Bhatt is eager to come to a fair and honorable settlement of this dispute. She is not, however, willing to be pressured into an inequitable agreement as a result of the impending court-martial charges." The letter tendered a photocopy of a certified check for $7,500.00 payable to SFC R for the Jaguar to settle the case. Appellant's attorneys previously tendered SFC R's attorney a certified check for $2,900.00 as a settlement offer, under which SFC R would keep the Jaguar. Sergeant First Class R counter offered that he would retain the Jaguar and accept $6,000.00, then $5,500.00, and finally $4,000.00 to settle the matter.

law, the mere asking of a question under certain circumstances is the equivalent of a command." *United States v. Gibson*, 3 U.S.C.M.A. 746, 752, 14 C.M.R. 164, 170, 1954 WL 2109 (1954) (questioning by fellow inmate did not violate Article 31, UCMJ, because it was a "conversation between equals").

First Lieutenant C was subject to the UCMJ and suspected appellant of committing an offense. A literal interpretation of Article 31(b), UCMJ, would require the suppression of appellant's statements to 1LT C. However, in 1954 our superior court rejected such a literal interpretation as inconsistent with Congressional intent. *See Gibson*, 14 C.M.R. at 170–71. *See also United States v. Duga*, 10 M.J. 206, 208–11 (C.M.A.1981). More importantly, in almost fifty years since *Gibson*, Congress has not changed Article 31, UCMJ, to overrule *Gibson's* narrowing interpretation of the applicability of Article 31, UCMJ.[16]

■ The *Duga* case established a two-pronged test for applying Article 31, UCMJ, warnings:

> [I]n each case it is necessary to determine whether (1) a questioner subject to the Code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation.

16. *See* Military Rule of Evidence 305 for the Presidential implementation of Article 31, UCMJ.

17. *United States v. Fisher*, 21 U.S.C.M.A. 223, 225, 44 C.M.R. 277, 279, 1972 WL 14092 (1972); *United States v. Bowerman*, 39 M.J. 219, 221 (C.M.A.1994). While *Fisher* was a pre-*Duga* case, it was cited with approval immediately after a discussion of the *Duga* holding in *Moses*, 45 M.J. at 134–35.

18. *United States v. Raymond*, 38 M.J. 136, 137 (C.M.A.1993).

19. *United States v. Moore*, 32 M.J. 56, 60 (C.M.A. 1991).

20. *United States v. Loukas*, 29 M.J. 385, 389 (C.M.A.1990).

21. *United States v. Guron*, 37 M.J. 942, 947 (A.F.C.M.R.1993), *aff'd by summary disposition*, 45 M.J. 12 (1996).

*Duga*, 10 M.J. at 210. Without overruling the two-pronged *Duga* test, more recent cases have held that a person questioning a "suspect" must give Article 31, UCMJ, rights warnings if the questioner "is participating in an official law enforcement or disciplinary investigation or inquiry." *United States v. Swift*, 53 M.J. 439, 446 (2000) (citing *United States v. Moses*, 45 M.J. 132, 134 (1996)); *see also United States v. Shepard*, 38 M.J. 408, 411 (C.M.A.1993).

An official duty or responsibility to question a "suspect," for a purpose that is not primarily for disciplinary or law enforcement reasons, can negate the requirement for a rights advisement. Article 31, UCMJ, warnings are not required to be given by: (1) a military doctor,[17] psychiatric social worker,[18] or nurse[19] prior to asking questions of a patient for medical diagnosis or treatment; (2) an in-flight aircraft crew chief prior to questioning, for operational reasons, an irrational crewman about possible drug use;[20] (3) military pay officials questioning a servicemember about a pay or allowance entitlement;[21] or (4) a negotiator trying to end an armed standoff, provided the discussion was truly designed to end the standoff, rather than to obtain incriminating statements to be used against the suspect at trial.[22] However, military appellate courts have also held that military defense counsel may not deliberately seek incriminating answers from a suspect unrepresented by counsel without first giving Article 31, UCMJ, rights warnings.[23]

22. *Moses*, 45 M.J. at 135.

23. *United States v. Milburn*, 8 M.J. 110, 113 (C.M.A.1979). *Milburn* is a pre-*Duga* case that our superior court has neither overruled nor relied upon again for this point. *Milburn* relied upon "military due process and fundamental fairness," rather than Article 31, UCMJ, as the legal basis for its holding that the in-court testimony of Milburn at an earlier court-martial was inadmissible. "[W]henever the accused or a suspect could perceive that the position of authority of these officers (military defense counsel) is the moving force behind requiring possible incriminating answers to these questions, the warnings must be given." *Milburn*, 8 M.J. at 112 n. 2. In *United States v. Rexroad*, 9 M.J. 959, 960 (A.F.C.M.R.1980), another pre-*Duga* case, our sister court held that military defense counsel may not deliberately seek incriminating answers from a suspect unrepresented by counsel, relying on the *Milburn* holding. Military appellate

To avoid Article 31, UCMJ, sanctions for official questioning not preceded by rights warnings, the inquiry must be limited to that required to fulfill the official purpose, unrelated to the law enforcement or disciplinary purpose, that precipitated the questioning. *See Loukas,* 29 M.J. at 389. Even when the questioning begins for a legitimate purpose by one who has no law enforcement or disciplinary power over a suspect, Article 31, UCMJ, rights are required if, and when, the "questioner is endeavoring to perfect a criminal case against the suspect." *Fisher,* 44 C.M.R. at 278–79 (citation omitted). When questioning is designed to satisfy both a legitimate military mission and to elicit information for use in a disciplinary proceeding, the issue must be resolved on a case-by-case basis. *Swift,* 53 M.J. at 446.

In appellant's case, the military judge made extensive findings of fact and concluded that the first *Duga* prong was not satisfied because 1LT C had an independent duty to investigate the facts as a legal assistance attorney.[24] Appellant argues that the first *Duga* prong was satisfied precisely because 1LT C was solely acting in his "official" legal assistance capacity, and not out of any personal motivation.

As discussed above, the 1981 *Duga* decision is not the final arbitrator of Article 31, UCMJ, rights warnings requirements. The issue is not whether the questioner is participating in *any official* questioning, but rather whether the primary focus of the questioning relates to an *official law enforcement or disciplinary investigation or inquiry.* Article 31, UCMJ, rights warnings are not required prior to official questioning related to a valid military mission, such as legal assistance. *See Swift,* 53 M.J. at 446 (and cases cited therein); *see also* 10 U.S.C. § 1044 (authorizing the provision of legal assistance

to members of the Armed Forces "in connection with their personal civil legal affairs").

We hold that 1LT C was not required to advise appellant of her Article 31, UCMJ, rights prior to questioning her in his official capacity as a legal assistance attorney for SFC R. When 1LT C initially began questioning appellant about her alleged debt to his client, 1LT C was doing so solely in his official capacity as a legal assistance attorney as authorized by Army regulation.[25] Appellant, who was superior to 1LT C in rank and military experience, understood that 1LT C was conducting his inquiry into the legitimacy of the unpaid debt solely as the legal representative of SFC R, and not on behalf of appellant's chain of command or law enforcement authorities. First Lieutenant C's questioning "created neither a coercive atmosphere nor an atmosphere where appellant thought she was required to cooperate." *United States v. Harvey,* 37 M.J. 140, 144 (C.M.A.1993).

After it became clear to 1LT C that appellant could not or would not pay SFC R, he began to question appellant about what he believed were "forgeries" in the promissory note. In doing so, the purpose of his questioning *arguably* shifted from that required to fulfill his responsibilities as a legal assistance attorney to obtaining incriminating responses from appellant concerning the altered promissory note for use in a possible court-martial. *See Loukas,* 29 M.J. at 389; *Fisher,* 44 C.M.R. at 278–79. We need not determine whether 1LT C was required to advise appellant of her Article 31, UCMJ, rights when his purpose arguably became "disciplinary," however, because none of appellant's comments concerning the alterations to the promissory note (see para. 17,

courts have long held that the Article 31, UCMJ, requirement for warnings does not apply at trials. *See United States v. Bell,* 44 M.J. 403, 405–06 (1996).

**24.** While we are in general agreement with the military judge's findings of fact, we have elected to substitute our own more extensive findings of fact to cover issues, in addition to the suppression motion, raised during our review. UCMJ art 66(c); *see United States v. Morris,* 44 M.J.

841, 843 (Army Ct.Crim.App.1996), *aff'd,* 49 M.J. 227 (1998).

**25.** *See* Army Reg. 27–3, Legal Services: The Army Legal Assistance Program, para. 3–7(d) (10 Sept. 1995) ("Legal negotiation involves one or more discussions between an attorney representing a client with another party (or his or her attorney) whose interests will usually be adverse to that client.").

findings of fact) were offered or admitted into evidence on the merits.[26]

## Multiplicity

The original charges and their specifications were preferred on 26 September 1997.

CHARGE I: VIOLATION OF THE UCMJ, ARTICLE 133

SPECIFICATION: In that Captain Ina J. Guyton–Bhatt, U.S. Army, being indebted to Sergeant First Class [R] in the sum of $7,500.00 for the purchase of a 1986 Jaquar (sic) XJ64D, vehicle identification number SAJAY1343GC444288, which amount became due and payable on or about 1 September 1996, did, at or near Fort Lewis, Washington from on or about 1 September 1996 to on or about 25 August 1997, dishonorably fail to pay said debt.

CHARGE II: VIOLATION OF THE UCMJ, ARTICLE 134

SPECIFICATION: In that Captain Ina J. Guyton–Bhatt, U.S. Army, being indebted to Sergeant First Class [R] in the sum of $7,500.00 for the purchase of a 1986 Jaquar (sic) XJ64D, vehicle identification number SAJAY1343GC444288, which amount became due and payable on or about 1 September 1996, did at or near Fort Lewis, Washington, from on or about 1 September 1996 to on or about 25 August 1997, dishonorably fail to pay said debt.

The Additional Charge and its Specification were preferred on 6 November 1997.

ADDITIONAL CHARGE: VIOLATION OF THE UCMJ, ARTICLE 133

SPECIFICATION: In that Captain Ina J. Guyton–Bhatt, U.S. Army, being indebted to Sergeant First Class [R] in the sum of $7,500.00 for the purchase of a 1986 Jaquar (sic) XJ64D, vehicle identification number SAJAY1343GC444288, which amount became due and payable on or about 1 September 1996, did, at or near Fort Lewis, Washington from on or about 1 September

1996 to on or about 25 August 1997, dishonorably and wrongfully lie to SFC [R], an individual who knew the said CPT Guyton–Bhatt's position as an officer in the U.S. Army, by telling him that she was not receiving military pay, a statement then known by the said CPT Guyton–Bhatt to be so (sic) false, and by presenting to SFC [R] a promissory note which had been altered without his concurrence with the altered terms on the promissory note, said actions being taken in order to dishonorably and wrongfully fail to pay a just debt.

The military judge granted appellant's pretrial motion to dismiss Charge II and its Specification as multiplicious with, and a lesser-included offense of, Charge I and its Specification. The military judge denied appellant's motion for further relief on multiplicity, finding that the Specification of Charge I was a separate offense from the Specification of the Additional Charge. We agree with appellant that the military judge erred by denying additional relief.

The Specification of the Additional Charge contains three separate allegations of misconduct: (1) failure to pay a just debt; (2) lying to SFC R; and (3) presenting an altered promissory note to SFC R. The failure to pay a just debt portion of this specification is facially duplicative with the Specification of Charge I. *See United States v. Harwood*, 46 M.J. 26, 28–29 (1997); *United States v. Lloyd*, 46 M.J. 19, 23–24 (1997). In appellant's case, the military judge should either have dismissed Charge I and its Specification or dismissed the duplicative language concerning the failure to pay a just debt in the Specification of the Additional Charge. We will grant appropriate relief in our decretal paragraphs.

## Mistake of Fact Instruction

Appellant alleges that the military judge erred by failing to instruct the members on a

---

**26.** During the suppression motion, 1LT C testified about both portions of his conversation with appellant (the validity of the debt and the altered promissory note). The military judge did not suppress either portion of the conversation. Although not part of the record of trial for our Article 66, UCMJ, review, we note that at the Article 32, UCMJ, hearing 1LT C testified that appellant denied making any alterations to the

promissory note. During the suppression motion, 1LT C testified that he could not recall what appellant had told him regarding the alterations to the promissory note. No one asked him about it during the trial on the merits. At trial, appellant testified that she changed the promissory note after it was notarized and before she sent it to SFC R (see para. 10, findings of fact).

mistake of fact concerning the offense of dishonorable failure to pay a just debt. Civilian defense counsel requested the standard mistake of fact instruction, properly tailored to the facts of appellant's case. *See* Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 5–11–2 (30 Sep. 1996) (C1, 30 Jan. 1998) [hereinafter Benchbook]. Civilian defense counsel argued that the evidence established that appellant reasonably believed that SFC R had agreed to rely on the promissory note and wait for payment until June 1997. The military judge found that mistake of fact was not reasonably raised by the evidence and refused to instruct the members on it, although she did instruct on financial inability. *See* Benchbook, para. 5–10.

◼ We review a military judge's refusal to give an instruction under an abuse of discretion standard. *United States v. Anderson*, 51 M.J. 145, 153, *cert. denied*, 528 U.S. 1023, 120 S.Ct. 534, 145 L.Ed.2d 414 (1999) (citing *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993)).

◼ We hold that the military judge clearly abused her discretion when she refused to give the mistake of fact instruction. Appellant testified that she and SFC R became friends, and that he told her shortly after their initial meeting that if he had met her sooner he would have let her use the car indefinitely as a friend without payment of any money. Sergeant First Class R testified that his friendship with appellant ended within a month or so of the transfer of his car to her, but admitted that he continued to call appellant by her first name. On rebuttal, the trial counsel asked SFC R his opinion regarding appellant's truthfulness. Sergeant First Class R stated that he could not describe what he felt about appellant's truthfulness and began to weep so uncontrollably that the military judge had to give the trial counsel a recess in order for SFC R to compose himself. After the recess, SFC R was not asked about appellant's truthfulness. There was considerable testimony by both appellant and SFC R about his "working with" appellant after no payment was made in September 1996, as well as SFC R's apparent acquiescence to extending the pay-

ment due dates. First Lieutenant C, SFC R's own attorney, testified that he (1LT C) thought that SFC R had extended the next payment due date to 15 January 1997. Appellant specifically testified that she believed her next payment was not due until June 1997, the date for the next payment on the promissory note she provided to SFC R. Considering the evidence as a whole, the defense was sufficiently raised to warrant the requested mistake of fact instruction.

However, even if accepted by the members, the improperly denied instruction only served as a legal defense to the dishonorable failure to pay a just debt until 16 June 1997, the next payment due date on the altered promissory note (PE 4). It would not have provided any defense for that offense for the three $500.00 payments missed during the period from 16 June 1997 through 25 August 1997. We will rectify this instructional error with appropriate remedial action in our decretal paragraphs.

### Transfer of Ownership under Washington State Law

◼ Appellant asserts on appeal that there was no just debt because there was no transfer of ownership of the Jaguar automobile to appellant under Washington state law. In support of her argument, appellant cites to the following provision of the Washington Code:

> If an owner transfers his or her interest in a vehicle, other than by the creation, deletion, or change of a security interest, the owner shall, at the time of delivery of the vehicle, execute an assignment to the transferee.... The owner shall notify the department or its agents or subagents, in writing, on the appropriate form, [of information concerning the sale and purchaser]...

Wash. Rev.Code § 46.12.101(1). Appellant does not cite, however, any Washington state or military case law to support this assignment of error.

There was no evidence that appellant sought to have the Jaguar registered in her name. Her remedy for any refusal to transfer the title upon her request would have been to rescind the purchase or seek specific

performance (delivery of the title), but not to retain the Jaguar without paying for it.

Our review of military precedent discloses no cases in which state law was successfully used as an affirmative defense to a charge of failure to pay a just debt. Our superior court has declined to set aside a guilty plea to failure to pay a just debt because the interest rate may have been usurious under state law, noting that "appellant has not presented any support for the proposition that Oklahoma recognizes usury as a complete defense to a criminal charge arising from failure to repay that loan." *United States v. Lark*, 47 M.J. 435, 437 (1998).

We specifically find that SFC R's failure to record the sale of the Jaguar with Washington state motor vehicle authorities did not vitiate appellant's debt or permit her to rescind her agreement to pay SFC R, because she retained possession of the vehicle and never requested the certificate of title with the intent to register the Jaguar. *See Terpstra v. Grand Mobile Trailer Sales*, 352 Mich. 546, 90 N.W.2d 504 (1958); *Hymer v. Dude Hinton Pontiac, Inc.*, 332 S.W.2d 467 (Mo.Ct. App.1960); M.L. Cross, Annotation, *Rights of Seller of Motor Vehicle with Respect to Purchase Price or Security on Failure to Comply with Laws Concerning Transfer of Title*, 58 A.L.R.2d 1351 (1958).

It is clear that under Washington state law appellant's initial oral promises to pay SFC R, as well as their modifications in the payment schedule, were not enforceable in state court.[27] Nevertheless, appellant, having taken no action to rescind the sale, retained a clear responsibility as an officer under Article 133, UCMJ, to pay her debt of $500.00 per month starting 16 June 1997 in accordance with the promissory note she delivered to SFC R. Regardless of whether her conduct was a crime under Washington state law, it was a serious breach of the justice, morality and decorum expected of an officer, under circumstances which brought dishonor, disgrace, and disrepute upon the military profession which she represents. *See United*

States v. Rogers, 54 M.J. 244, 256 (2000) (citing *Parker v. Levy*, 417 U.S. 733, 753–54, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)); *see also* William Winthrop, *Military Law and Precedents* 711–12 (2d ed. 1920 Reprint).

### Factual Sufficiency

This court may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." UCMJ art. 66(c). When testing for factual sufficiency, we must, after weighing the evidence and making allowances for not having seen the witnesses in person, be convinced that an accused is guilty beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

Concerning the Specification of Charge I, the government failed to prove that the sum of $7,500.00 "became due and payable on or about 1 September 1996." Even under the terms of the original oral contract, the initial $500.00, which appellant paid, was the only payment due by 1 September 1996. Assuming that the contract was never modified, appellant's debt increased by $500.00 each month for eight months, with the remaining balance due in the ninth month (May 1997). Accordingly, the entire $7,500.00 balance would not have become due and payable until on or about 1 May 1997, not 1 September 1996.

Additionally, we are not persuaded beyond a reasonable doubt that SFC R did not agree to change the original payment schedule. He and appellant both testified that on several occasions SFC R reaffirmed that he was willing to work with appellant or that he decided to give her some more time in which to make her payments. First Lieutenant C testified that he believed that SFC R accepted the modified payment terms as reflected in the unaltered promissory note executed on 1 November 1996. The record does not persuade us beyond a reasonable doubt that SFC R did not acquiesce to the 16 June 1997

---

**27.** Under Washington state law, a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought, or by his authorized agent or broker. *See* Wash. Rev.Code § 62A.2–201(1)(1998). *See also* Wash. Rev.Code § 19.36.010.

date for resumption of payments, as reflected in the altered promissory note.

Concerning the promissory note, we find nothing criminal about appellant's alterations. The execution of a promissory note was not part of the original oral contract in this case. Sergeant First Class R had no legal entitlement to a promissory note nor was appellant legally required to complete one. No legal rights were automatically vested in SFC R upon the notarization of appellant's signature on the original promissory note on 1 November 1996. Prior to delivery of that note to SFC R or someone on his behalf, appellant could have destroyed the note (e.g., after talking with an attorney) without any legal consequence, because she received no legal consideration from SFC R for the promissory note. In lieu of destroying the original note altogether, appellant changed the conditions upon which she was willing to gratuitously provide a promissory note to enforce the original oral contract. Legally, her action was the same as returning to legal assistance, destroying the 1 November 1996 note, and executing a new note with new terms. *Cf. United States v. Mansfield*, 22 C.M.R. 667, 669–70, 1956 WL 4851 (N.B.R.1956) (holding that, like a promissory note, no criminality attaches to the issuance of a post-dated check with full disclosure that funds will not be available until a specified future date).

Finally, the record of trial does not prove beyond a reasonable doubt that appellant lied about her pay problems for the entire period 1 September 1996 to 25 August 1997, as charged. We find, however, that appellant's failure to pay SFC R from June 1997 through August 1997, as stated in the promissory note, was "characterized by deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate nonpayment or grossly indifferent atti-

tude toward one's just obligations." *United States v. Polk*, 47 M.J. 116, 120 (1997). The evidence was uncontroverted that she failed to pay her debt or make any arrangement for partial payment. She falsely claimed that she was not being paid by the Army. She showed a "grossly indifferent attitude" and "bad faith" towards her obligation to pay SFC R. We will take appropriate remedial action concerning all these factual insufficiencies in our decretal paragraphs.

## Ethical Considerations

At several places in the record of trial and the allied papers, members of the defense team intimated that SFC R's attorneys used the threat of a court-martial to gain an unfair advantage in the negotiations to settle appellant's debt. *See supra* notes 14–15.[28] Because the Army and some state bar authorities have significantly different rules concerning the threat of criminal charges to secure a negotiation advantage in the settlement of an unpaid debt, a prudent judge advocate will exercise great caution in this area. *See generally* Patrick O. Gray, *May a Lawyer Threaten Criminal Prosecution in Order to Obtain Advantage in a Civil Matter?*, 21 J. Legal Prof. 207 (1996–1997); Major Richard P. Laverdure, *The Threat of Criminal Sanctions in Civil Matters: An Ethical Morass*, Army Law. 16 (Jan.1989).

We suggest that all judge advocates review Disciplinary Rule 7–105, "Threatening Criminal Prosecution," of the 1980 Model Code of Professional Responsibility, upon which some state codes of professional responsibility still rely. The Rule states: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." *Model Code of Prof'l Responsibility* DR 7–105 (1980).[29]

---

**28.** As a crime victim, SFC R and his attorneys had a right to seek restitution. *See generally* 42 U.S.C. §§ 10601–10608 and Army Reg. 27–10, Legal Services: Military Justice, ch. 18 (24 June 1996) [hereinafter AR 27–10]. A staff judge advocate is required, in appropriate cases, to assist crime victims who seek restitution. AR 27–10, paras. 18–10(a)(6) and (b). The chain of command may also take restitution and victim impact into consideration when making a disposi-

tion decision. *See* Rule for Courts–Martial 306(b) discussion.

**29.** Rules of professional responsibility in the Army and the majority of states rely upon the Model Rules of Professional Conduct, first adopted by the American Bar Association in 1983, rather than the older Model Rules of Professional Responsibility. There is no counterpart

With respect to 1LT C's conduct, Rule 4.4 of our professional responsibility rules expressly prohibits an Army lawyer from using methods of obtaining evidence that violate the legal rights of a third person. Army Reg. 27–26, Legal Services: Rules of Professional Conduct for Lawyers, Rule 4.4 (1 May 1992). We recognize that the comment to this rule authorizes an Army attorney to "communicate a correct statement of fact that includes the possibility of criminal action if a civil obligation is not fulfilled." However, whether or not violative of our rules of professional responsibility, judge advocates should be mindful that the use, or the perception thereof, of the court-martial process to gain an unfair advantage in settlement negotiations of a civil debt tends to diminish public confidence in our military justice system. *See Model Code of Prof'l Responsibility* Ethical Consideration 7–21 (1980).

### Decision

The court affirms only so much of the findings of guilty of Charge I and its Specification as finds that appellant, being indebted to Sergeant First Class [R] in the sum of $1,500.00 for the purchase of a 1986 Jaguar XJ64D, which amount became due and payable in $500.00 increments on or about 16 June 1997, 16 July 1997, and 16 August 1997, did, at or near Fort Lewis, Washington, from on or about 16 June 1997 to on or about 25 August 1997, dishonorably fail to pay said debt, in violation of Article 133, Uniform Code of Military Justice.

The court affirms only so much of the findings of guilty of the Additional Charge and its Specification as finds that appellant did, at or near Fort Lewis, Washington, from on or about 1 February 1997 to on or about 30 April 1997, dishonorably and wrongfully lie to Sergeant First Class [R], an individual who knew appellant's position as an officer in the U.S. Army, by telling him that she was not receiving military pay, a statement then known by appellant to be false, in violation of Article 133, Uniform Code of Military Justice.

Reassessing the sentence on the basis of the errors noted, the principles in *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), and the entire record, the court affirms only so much of the sentence as provides for forfeiture of $1,000.00 pay per month for eighteen months and that portion of the reprimand that reads. You were found guilty of conduct unbecoming an officer by dishonorably failing to pay a just debt and lying to a noncommissioned officer. Conduct such as this will not be tolerated in this command. Your actions call into serious question your integrity as an officer, your judgment and your ability for further service in the United States Army.

Chief Judge MARCHAND and Judge HARVEY concur.

to Disciplinary Rule 7–105 in the Model Rules of Professional Conduct.